Craig **ZEBROSKI**, Defendant Below, Appellant,

v.

**STATE** of Delaware, Plaintiff Below, Appellee.

No. 482,2001.

Supreme Court of Delaware.

Submitted: Oct. 8, 2002.
Decided: May 14, 2003.

Kevin J. O'Connell and Jerome M. Capone, Wilmington, for appellant.

Thomas E. Brown of the Department of Justice, Wilmington, for appellee.

Before VEASEY, Chief Justice, HOLLAND, STEELE, Justices and WALSH * and HARTNETT,* Retired Justices.

STEELE, Justice:

Craig Zebroski appeals the judgment of the Superior Court denying his Motion for Postconviction Relief from his 1997 conviction for the murder of Joseph Hammond during a gas station robbery.[1] Zebroski

---

* Sitting by designated pursuant to Art. IV § 12, of the Delaware Constitution and Supreme Court Rules 2 and 4.

1. On January 28, 1997, a jury convicted Zebroski of two counts of first degree murder and related crimes. After a separate penalty hearing, by a 9–3 vote, the jury recommended the

claims four errors in this appeal: (i) trial counsel's failure to advocate a more expansive *voir dire* amounted to ineffective assistance of counsel; (ii) trial counsel's failure to investigate competently and present a case for mitigation during the penalty phase of his trial amounted to ineffective assistance of counsel; (iii) appellate counsel's failure to present a "lingering doubt" argument amounted to ineffective assistance of counsel; and (iv) Delaware's statutory scheme for the imposition of the death penalty violates the Due Process Clause of the United States Constitution. Because Zebroski's arguments are without merit, we AFFIRM.

## I.

The events leading to the present appeal are recited in this Court's decision upholding Zebroski's convictions on direct appeal.[2] In summary, on May 1, 1996, a

grand jury indicted Zebroski for various charges, including two counts of murder in the first degree.[3] At trial, Zebroski claimed that he accidentally shot Joseph Hammond between the eyes. According to Zebroski, immediately before he fired the gun, his codefendant punched Hammond in the face. Zebroski testified that the punch startled him, causing him to flinch and accidentally pull the trigger. The State contended, however, that he intended to shoot Hammond. In support of this position, the prosecution presented testimony from a Bureau of Alcohol, Tobacco, and Firearms' examiner that it required 12½ pounds pressure on the trigger for the gun to fire.

By contrast, the penalty hearing centered on Zebroski's behavior after the shooting and his poor record, compared against his youth, his substance abuse and

death penalty. Taking the jury's recommendation into consideration and after reviewing the record, the Superior Court found that the aggravating factors outweighed the mitigating factors and imposed a death sentence. *State v. Zebroski,* 1997 Del.Super. LEXIS 304 (Del.Super.). On July 28, 1998, this Court affirmed his convictions. *Zebroski v. State,* 715 A.2d 75 (Del.1998). Almost immediately after this Court's decision, Zebroski filed a *pro se* motion for postconviction relief. Super. Ct.Crim. R. 61(b). In response, the Superior Court appointed new counsel for Zebroski. Super. Ct.Crim. R. 61(e). His new counsel then filed an amended motion for postconviction relief alleging ineffectiveness of Zebroski's trial and appellate counsel, and included requests to expand the record and for a hearing. The court granted leave to expand the record and it held a full evidentiary hearing followed by formal briefing. On August 31, 2001, the Superior Court denied Zebroski's motion for postconviction relief. *State v. Zebroski,* 2001 WL 1079010, 2001 Del.Super. Lexis 344 (Del.Super.). Zebroski appealed, and in due course the parties exchanged briefing and participated in oral argument on May 14, 2002. On June 7, 2002, this Court stayed further proceedings "pending issuance of the decision in *Arizona v. Ring,* 200 Ariz.

267, 25 P.3d 1139 (2001), *cert granted sub nom. Ring v. Arizona,* 534 U.S. 1103, 122 S.Ct. 865, 151 L.Ed.2d 738 (2002)." *Zebroski v. State,* Del.Supr., No. 482, 2001, Veasey, C.J. (June 7, 2002). On June 24, 2002, the United States Supreme Court issued a decision in the case: *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). By order dated July 16, 2002, this Court lifted the stay and directed the parties to file supplemental memorandums addressing the issues of: (i) the effect, if any, of *Ring v. Arizona* on this case; and (ii) the effect, if any, of 11 *Del. C.* § 4209 (as amended by S.B. 449, if signed into law) on this case. On July 22, 2002, the Governor of Delaware signed S.B. 449 into law. By order dated October 24, 2002, this Court directed the parties to file simultaneous memorandums addressing three decisions from the Supreme Courts of Florida and Indiana which discuss *Ring's* effect on capital cases: *Bottoson v. Moore,* 833 So.2d 693, 2002 WL 31386790 (Fla.); *King v. Moore,* 831 So.2d 143, 2002 WL 31386234 (Fla.); and *Wrinkles v. State,* 776 N.E.2d 905 (Ind.2002).

**2.** *See Zebroski,* 715 A.2d at 75.

**3.** 11 *Del. C.* §§ 636(a)(1) and (2).

the adverse circumstances surrounding Zebroski's childhood.

## II

■ We review for an abuse of discretion a Superior Court judge's denial of a motion for postconviction relief based on ineffective assistance of counsel. Nevertheless, we carefully review the record to determine whether "competent evidence supports the court's findings of fact and whether its conclusions of law are not erroneous."[4] Questions of law are reviewed *de novo*.[5]

■ To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy a two-pronged test: (1) that trial (or appellate) counsel's actions fell below an objective standard of reasonableness and (2) there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the trial (or appeal) would have been different.[6] Mere allegations of ineffectiveness will not suffice. A defendant must make specific allegations of actual prejudice and substantiate them.[7] Moreover, any "review of counsel's representation is subject to a strong presumption that the representation was professionally reasonable."[8]

## III

Zebroski's claims that trial counsel provided constitutionally deficient, ineffective representation falls into four categories. First, trial counsel failed to request an expansive, open-ended *voir dire* of prospective jurors.

Second, Zebroski asserts that trial counsel's failure to investigate properly and present a mitigation case in the penalty phase unfairly prejudiced him. Zebroski claims there are several reasons that "powerful evidence" was never placed before the jury and the court.[9]

Third, "in view of [trial counsel's] already heavy caseload, including other capital cases, it was inappropriate for trial counsel to handle Zebroski's capital murder defense without the assistance of other counsel."[10] Zebroski contends trial counsel lacked the ability to provide the day-to-day oversight and guidance necessary for the presentation of mitigation evidence in the penalty phase.

Fourth, Zebroski claims that the information gathering process for mitigation evidence began far too late for Zebroski to have received a fair penalty hearing. According to Zebroski, this delay could have resulted simply from trial counsel handling both stages of the proceedings alone, but regardless, the delay prejudiced him because it resulted in a failure to present appropriate counselors, teachers and other professionals as witnesses at trial. If not for this delay in preparation, Zebroski asserts that he could have presented more detailed testimony concerning his horrific childhood and the effects of PCP (Phencyclidine) on the issues of premeditation and criminal intent.

---

4. *Outten v. State,* 720 A.2d 547, 551 (Del. 1998) (quoting *Dawson v. State,* 673 A.2d 1186, 1190, 1196 (Del.1996)).

5. *Id.*

6. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Wright v. State,* 671 A.2d 1353, 1356 (Del. 1996).

7. *Wright,* 671 A.2d at 1356; *Younger v. State,* 580 A.2d 552, 555–56 (Del.1990).

8. *Flamer v. State,* 585 A.2d 736, 753 (1990).

9. Appellant's Op. Br. at 25.

10. *Id.* at 25–26.

Finally, Zebroski contends that the trial judge's analysis in his postconviction opinion dealt with each allegation of ineffectiveness piecemeal. Instead of a piecemeal analysis, Zebroski argues that an ineffective assistance of counsel claim here required an analysis focused on the totality of errors and their cumulative impact on the presentation at the penalty hearing.

## A. Failure to Request Expansive *Voir Dire.*

▪ Zebroski argues initially that trial counsel failed to meet constitutional standards because he did not request a more expansive jury *voir dire.* Zebroski cites jury expert Dr. Valerie P. Hans' evidentiary hearing testimony to support his claim. Dr. Hans testified that she reviewed the *voir dire* and reached several conclusions. First, the jurors failed to understand the important concepts of aggravating and mitigating circumstances as well as the definition of what constitutes first degree murder. Second, the context material provided by the Superior Court was at best confusing and at worst misleading. Finally, the Court's wording of the death and life qualifying questions rarely reveal the "true feelings" of the potential jurors because the questions are "close ended" and suggest a socially desirable answer.

▪▪▪▪ The primary purpose of *voir dire* examination is to elicit prospective jurors' bias or prejudice.[11] The goal is to secure for the defendant and the State impartial jury members who will be able to decide the case on the basis of the evidence presented at trial and who will follow the court's instructions on the law.[12] The standard for excluding a juror because of the juror's views on capital punishment is whether the views would prevent or substantially impair the performance of the juror's duties in accordance with the jury instructions and oath.[13] "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do" and is not qualified to sit on the jury.[14] Although open-ended *voir dire* questions may be preferable, they are not constitutionally required.[15]

Here, the trial judge first addressed the *venire* as a whole and then conducted an individualized *voir dire* with each prospective juror. The trial judge also took into account information contained on the jury questionnaires. In addition, the trial judge asked specific death and life qualifying questions:

> Do you believe that anyone convicted of murder in the first degree should automatically be given the death penalty regardless of the presence of any mitigating circumstances and regardless of the Court's instructions on the law?

> If you found the defendant guilty of murder in the first degree, would you automatically vote in favor of a sentence

11. *Manley v. State,* 709 A.2d 643, 654 (Del. 1998); *DeShields v. State,* 534 A.2d 630, 634 (Del.1987).

12. *Id.; Hughes v. State,* 490 A.2d 1034, 1041 (Del.1985)

13. *Manley,* 709 A.2d at 654 (citing *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

14. *Manley,* 709 A.2d at 654 (quoting *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)).

15. *Reyes v. State,* 819 A.2d 305, 310, 2003 Del. Lexis 170, *10 (Del.Supr.2003); *Barrow v. State,* 749 A.2d 1230, 1237 (Del.2000); *Manley,* 709 A.2d at 655.

of death, irrespective of the facts or Court's instructions of law? [16]

Counsel for each party observed the process, and out of the presence of the particular juror being interviewed, was permitted to suggest additional lines of inquiry. The trial judge noted:

> Careful review of the entire jury selection shows considerable back-and-forth between the court and counsel and between the court and the prospective jurors. Overall, the process was unhurried and almost collaborative. Time and again, prospective jurors asked questions and voiced concerns. In several instances, several jurors spoke up after they were seated. This highlights the fact that prospective jurors understood that they were involved in something complicated and important.[17]

Our review of the record leads us to conclude that the jury selection *voir dire* was adequate for the trial judge to determine whether each prospective juror would be impartial. In addition, this Court has consistently held that although open-ended questions may be preferable, they are not constitutionally required. This case does require that we readdress that issue because here we do not face a situation where the trial judge refused counsel's request for an open-ended *voir dire.* Rather, Zebroski asserts his trial counsel provided ineffective assistance by not requesting an open-ended *voir dire.* If our precedent has specifically stated that open-ended *voir dire* is not constitutionally required, we cannot reasonably find Zebroski's counsel ineffective for not requesting an open-ended *voir dire* examination.

## B. A Single Defense Counsel Constitutes Ineffective Assistance *Per Se.*

■ Zebroski claims "it was inappropriate for [defense counsel] to handle Zebroski's capital defense without the assistance of other counsel." [18] The Superior Court judge, in his Opinion and Order denying Zebroski's Motion for Postconviction Relief, determined that Zebroski's trial counsel was very experienced in representing capital murder defendants with and without co-counsel. "Zebroski's trial attorney is among the most seasoned criminal litigators in Delaware. Since he started practicing law in 1972, trial counsel has represented almost 25 capital murder defendants." [19] The judge also noted that Zebroski's case was relatively straightforward and did not involve sophisticated scientific analysis or many witnesses.

Modern Delaware practice usually results in more than one trial attorney for a capital defendant. The Public Defender's Office routinely assigns two Public Defenders to defend capital cases. We recognize that fundamental fairness entitles indigent defendants in a capital case to the basic tools of an adequate defense:

> We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the [prosecution] proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.[20]

16. Appellant's Op. Br. at 12.

17. *State v. Zebroski,* 2001 WL 1079010, 2001 Del. Lexis 344 (Del.Super.).

18. Appellant's Op. Br. at 26.

19. *State v. Zebroski,* 2001 WL 1079010, 2001 Del.Super. Lexis 344 (Del.Super.).

20. *Ake v. Oklahoma,* 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

■ We also recognize that the American Bar Association recommends that each capital defendant possess a "lead counsel" who assembles a defense team with (a) at least one mitigation specialist and one fact investigator; (b) at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments; and (c) any other members needed to provide high quality legal representation.[21] We agree that, if feasible, staffing in a capital murder case in accordance with those standards, especially providing separate counsel in the penalty phase of a capital murder case, is desirable and, in a given case, lack of proper staffing could be a factor in weighing a claim of ineffective assistance of counsel, but this is not such a case.

The Public Defender's Office provided trial counsel here with logistical support including social workers, psychologists and other investigative case workers. Before trial, Zebroski's trial counsel ordered a detailed evaluation by a reputable psychologist. Our precedent requires that Zebroski must show that his trial counsel's actions fell below an objective standard of reasonableness and there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. Neither precedent nor logic demands that an objective standard of reasonableness requires a minimum threshold "team" of attorneys and related personnel in order to meet Sixth Amendment requirements. Conceivably, even a team of attorneys and other professionals could still provide ineffective assistance of counsel. *Strickland* and its progeny require a fact intensive, case-by-case analysis of the representation actually provided by defendant's counsel. Accordingly, we now turn to Zebroski's specific allegations of prejudice resulting from his alleged ineffective counsel representing him without co-counsel at trial.

## C. Trial Counsel's Presentation of Mitigation Evidence

■ All trial counsel in capital cases generally have a duty to "investigate potentially mitigating evidence for use at the penalty phase."[22] Meeting this duty does not require that counsel pursue "all lines of investigation," nor does it require that trial counsel present all potentially mitigating evidence, or even all mitigating evidence uncovered.[23] That other witnesses might have been available is insufficient, alone, to prove ineffective assistance of counsel.[24] "Counsel can make reasonable choices" and focus the investigation on what might best convince a jury to recommend life.[25] "To be reasonably competent, [counsel] need not present cumulative evidence."[26]

The trial judge listed several mitigating circumstances presented by trial counsel: Zebroski's youth;[27] Zebroski has a family that loves him; the dysfunctional nature of his family;[28] the presence of friends who

---

21. *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* Guideline 10.4—The Defense Team (Revised ed., Feb. 2003)

22. *Flamer,* 585 A.2d at 756; *Outten,* 720 A.2d at 552–53.

23. *Id.*

24. *Id.*

25. *Flamer,* 585 A.2d at 756; *Outten,* 720 A.2d at 553.

26. *Id.*

27. Zebroski was 19 years old at the time of the murder.

28. Trial counsel presented several witnesses to support this mitigating circumstance with the following factors: the alcoholism and

continue to support him; Zebroski's history of psychological problems and disorders; his history of substance abuse and addiction; the debilitating effects of alcohol and drugs on Zebroski's capacity for decisionmaking; the favorable prognosis for positive adjustment to prison; and Zebroski's punishment relative to his codefendant.

■ We disagree with Zebroski's claim that the process employed in order to develop and present mitigation evidence began far too late for Zebroski to have received a fair penalty hearing. The record reflects that trial counsel presented substantial evidence about Zebroski's personal history, the effects of his prolonged substance abuse, and the effects of his upbringing in a dysfunctional and abusive family. The Superior Court judge concluded:

> In fact, trial counsel spoke with Zebroski's mother even before Zebroski was charged. Before trial, Zebroski's trial counsel ordered and obtained a detailed evaluation by a reputable psychologist. From the outset, the public defender's office provided logistical support for trial counsel, including social workers, psychologists, and other investigative case workers. The record reveals that trial counsel was still assembling the mitiga-

tion case even after the trial was underway. But that is a far cry from any suggestions that trial counsel was not working on mitigation until after the trial had started.[29]

The record supports the trial judge's observations. Trial counsel prepared for the penalty phase immediately and proceeded in parallel with preparations for the guilt phase. Moreover, trial counsel emphasized the importance of preparing the mitigation case "immediately" because of the strength of the State's case in the guilt phase of the trial.[30] Trial counsel noted the difficulty of preparing simultaneously for both the guilt and penalty phases of a capital case: "It's one of the things that's a little bit difficult to explain to the family, that you're trying to prepare for a penalty phase at the same time you're trying to prepare a defense on the merits of the case."[31] Counsel's observation highlights that he was aware of the importance of developing mitigating evidence early in his representation.

Trial counsel also had the support of the entire Public Defender's Office. Beth Dewson, head of the forensic unit, assisted with the preparation of a mitigation case. Mel Slawik, holder of a master's degree in social work and a psychoforensic evaluator,[32] helped gather background informa-

---

mental health problems suffered by Zebroski's mother; the adverse conditions of his childhood development; the presence of numerous stepfathers with substance abuse problems; physical and mental abuse suffered by Zebroski as a child; observed physical and mental abuse inflicted by Zebroski on his mother and siblings; the desertion of Zebroski by his natural father; and the lack of appropriate male role models in Zebroski's life.

29. *State v. Zebroski*, 2001 WL 1079010, 2001 Del.Super. Lexis 344 (Del.Super.).

30. Appendix to Appellant's Op. Br. at 194 (defense counsel's testimony at Rule 61 evidentiary hearing).

31. *Id.* at 193.

32. According to the testimony in the Rule 61 evidentiary hearing, a psychoforensic evaluator gathers information about the defendant's background, reviews the records of the defendant, makes suggestions with respect to perspective mitigating witnesses from the records or interviews of relatives and generally supports trial counsel during the penalty phase of the trial. Appendix to Appellant's Op. Br. at 194 (defense counsel's testimony at Rule 61 evidentiary hearing).

tion about Zebroski and generally supported trial counsel in preparing for the penalty phase of the trial. Trial counsel also retained the services Dr. Mandell Much to develop Zebroski's personal history.

Zebroski asserts that the trial judge misinterpreted the factual record and therefore erred when reaching several conclusions about the mitigation case actually presented. Zebroski acknowledges that the trial judge concluded in his Postconviction Opinion that trial counsel spoke with Zebroski's mother before Zebroski was charged. Zebroski claims, however, that this meeting had nothing to do with preparation of a mitigation case. We believe the record contradicts Zebroski's assertion. Trial counsel testified that "I talked to [Zebroski's mother] about the process, I talked to her about the guilt/innocence phase, and I talked to her about her son's background and possible witnesses with respect to mitigation." Trial counsel testified that this conversation occurred a week after Zebroski's arrest.[33]

Zebroski also claims the trial judge erred by concluding that trial counsel ordered and obtained before trial a detailed evaluation by a reputable psychologist. Zebroski argues the evaluation occurred only days before trial and the final report became available two weeks after the start of Zebroski's trial. Trial counsel testified, however, that he instructed the psychologist to delay preparation of a report on Zebroski until a date closer to trial and therefore limit the time available for the state to prepare a response.[34]

Zebroski also asserts that trial counsel portrayed his mother as a victim rather than as a woman who suffered from alcoholism and who associated with abusive men. Zebroski's postconviction expert, Dr. Burry, opined that trial counsel's questioning of Zebroski's mother failed to highlight the domestic violence, child abuse, internal chaos, isolation, substance abuse, multiple stepfathers and paramours, and mental illness within the family. In the penalty phase, however, trial counsel's expert, Dr. Much testified in detail about Zebroski's personal history. In addition, trial counsel called a close family friend who testified about Zebroski's violent home life and the problems Zebroski had to confront as a result. In fact, the trial judge stated that the evidence presented by trial counsel concerning Zebroski's childhood was compelling and that Zebroski had almost no chance to develop into a non-violent, clear thinking, productive person.

Zebroski also complains that trial counsel inadequately presented the deleterious effects of PCP during the penalty phase. Zebroski presented expert testimony at the postconviction relief hearing highlighting the effects of intoxication with alcohol, marijuana, and PCP. Zebroski asserts that trial counsel's delay in preparing a mitigation defense prevented the jury from hearing the effect of PCP on Zebroski when he committed the murder. As the trial judge recognized, however, trial counsel retained Dr. Much not only to develop a record of Zebroski's personal history, but also to testify about the impact of Zebroski's substance abuse, including the effects of Zebroski's use of PCP. Trial counsel testified that he was familiar with the effects of PCP: "I mean I handled so many cases with PCP, and I know how absolutely terrible the drug is and what effects it has on people ... I'm not obviously a psychologist et cetera, but I mean I was aware of the that when I discussed the PCP issue with

---

**33.** Appendix to Appellant's Op. Br. at 194.

**34.** *Id.* at 207.

Doctor Much."[35] During the penalty phase, Dr. Much told the jury about Zebroski's use of PCP and effects of PCP on Zebroski's perceptions. Dr. Much told the jury that Zebroski would adjust and not be a dangerous person in prison because the problematic behavior would moderate if Zebroski abstained from drug and alcohol abuse. Dr. Much's testimony and conclusions were consistent with, and perhaps even rendered cumulative, the conclusions presented by Zebroski's expert in the postconviction relief hearing.

In sum, trial counsel made substantial efforts to discover and present the information that Zebroski suggests should have been better used in the penalty phase. Zebroski's postconviction relief motion claims that Zebroski omitted information as a result of inadequate preparation for the penalty phase that, in fact, *was* placed squarely before the jury. Thus, there is simply no reasonable probability that the result of the proceeding would have been different had trial counsel presented the evidence in the form advanced by Zebroski at the postconviction relief hearing.[36]

**D. Whether the Trial Judge Considered the Cumulative Effects of Trial Counsel's alleged ineffective Assistance of Counsel**

■ Finally, Zebroski contends that the analysis of the trial court in its postconviction opinion dealt with each allegation of trial counsel's ineffectiveness in a piecemeal fashion as opposed to a cumulative review. We find this argument unpersuasive because the trial judge found *no errors* in trial counsel's representation of Zebroski. Thus, a cumulative review of all the unfounded allegations of ineffective assistance of trial counsel would not change the result. Accordingly, the trial judge did not abuse his discretion by denying the ineffective assistance of trial counsel claim.

**IV**

■ Zebroski next contends that *appellate counsel* provided ineffective assistance for failing to raise and preserve an issue regarding "residual doubt" as a mitigating circumstance. Trial counsel, before the penalty hearing, notified the State and the Court that he intended to argue "lingering doubt" as a mitigating factor with respect to Zebroski's state of mind and intent to commit the murder. The trial judge ruled that the jury had "already made a determination that the defendant [was] guilty beyond a reasonable doubt and; that was the standard to which the jury [was] held in all aspects of this proceeding."[37] Zebroski asserts this ruling prevented the jurors from hearing the effect of ingestion of PCP and Zebroski's abusive past upon Zebroski's state of mind at the time of the shooting. Zebroski asserts that because this ruling constituted reversible error, appellate counsel should have raised the issue on appeal. Zebroski, therefore, claims that appellate's counsel's failure to include this argument among the six claims of error raised in Zebroski's direct appeal rendered his assistance ineffective.

"Residual doubt" has been defined as "a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.'"[38] The United States Supreme

---

**35.** Appendix to Appellant's Op. Br. at 194 (defense counsel's testimony at Rule 61 evidentiary hearing).

**36.** "To be reasonably competent, an attorney need not present cumulative evidence." *Flamer*, 585 A.2d at 757.

**37.** Appendix to Appellant's Op. Br. at 21.

**38.** *Franklin v. Lynaugh*, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring).

Court has held that in a capital case, the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense; however, that edict in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt.[39] Justice O'Connor, in her concurring opinion joined by Justice Blackmun notes:

> Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some States have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilty phase of the trial, but we have never indicated that the Eighth Amendment requires States to adopt such procedures. To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of "residual doubts" about guilt.[40]

Several jurisdictions have also held that presenting a "lingering doubt" argument as mitigating factor during the penalty phase is inappropriate.[41]

This Court has addressed the *Franklin* opinion in the context of allocution.[42] In *Shelton* and later in *Capano v. State*,[43] we discussed the parameters of a defendant's allocution. It is important to note that here the trial judge did not interfere with Zebroski's allocution. Zebroski told the jury that the killing was an accident. In Zebroski's case, the trial judge restricted only *trial counsel's* presentation of "lingering doubt" as a mitigating circumstance. Thus, we view our jurisprudence concerning the scope of allocution to be distinct from the scope of trial counsel's presentation of mitigating evidence.

Against this backdrop, we turn our attention to the more narrow issue presented in this appeal: Whether appellate counsel provided ineffective assistance of counsel by not arguing on appeal that the trial judge erred when he refused to allow trial counsel to present a "lingering doubt" argument in the penalty phase.

■■ Appellate counsel stated he considered and rejected presenting the issue

**39.** *Id.* at 174, 108 S.Ct. 2320 (plurality opinion) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)).

**40.** *Franklin*, 487 U.S. at 187–88, 108 S.Ct. 2320 (O'Connor, J. concurring) (internal citations omitted).

**41.** *Drinkard v. State*, 777 So.2d 225 (Ala.Cr. App. 1998), *rev'd on other grounds by Ex parte Drinkard*, 777 So.2d 295 (Ala.2000); *Ruiz v. State*, 299 Ark. 144, 772 S.W.2d 297 (1989); *People v. Snow*, 2003 Cal. Lexis 2072; *People v. Edgeston*, 157 Ill.2d 201, 191 Ill.Dec. 84, 623 N.E.2d 329 (1993); *Tamme v. Commonwealth*, 973 S.W.2d 13 (Ky.1998); *Grandison v. State*, 341 Md. 175, 670 A.2d 398 (1995); *Holland v. State*, 705 So.2d 307 (Miss.1997);

*Evans v. State*, 112 Nev. 1172, 926 P.2d 265 (1996); *People v. Harris*, 177 Misc.2d 165, 676 N.Y.S.2d 440 (N.Y.Sup.Ct.1998); *State v. Fletcher*, 354 N.C. 455, 555 S.E.2d 534 (2001); *State v. Coleman*, 2002 Ohio 5377, 2002 WL 31242241 (2002); *Commonwealth v. Fisher*, 813 A.2d 761 (Pa.2002); *State v. Southerland*, 316 S.C. 377, 447 S.E.2d 862 (1994), *overruled on other grounds by State v. Chapman*, 317 S.C. 302, 454 S.E.2d 317 (1995); *State v. Bigbee*, 885 S.W.2d 797 (Tenn.1994); *State v. Young*, 853 P.2d 327 (Utah 1993); *Lilly v. Commonwealth*, 255 Va. 558, 499 S.E.2d 522 (Va.1998), *rev'd on other grounds by Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

**42.** *Shelton v. State*, 744 A.2d 465, 496 (1999).

**43.** 781 A.2d 556, 660–68 (2001).

of residual doubt as a mitigating factor on direct appeal because he wanted to emphasize other arguments that, in the exercise of professional judgment, he believed were more likely to prevail. Although trial counsel suggested that the issue be presented on appeal, appellate counsel specifically disagreed with trial counsel and explained that under Delaware's capital sentencing scheme, the judge makes the ultimate sentencing decision. "A strategy, which structures appellate arguments on 'those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.'"[44] We find no error or ineffective assistance resulting from appellate counsel's strategic choice to omit a questionable argument on appeal.

## V

■ Zebroski argues that the United States Supreme Court decision in *Ring v. Arizona*[45] rendered the 1991 version of Delaware's death penalty statute unconstitutional.[46] *Brice v. State,*[47] decided after Zebroski advanced these arguments, resolves this issue. In *Brice*, this court addressed several questions concerning the 2002 amendment to § 4209, and held that *Ring* only extends to the narrowing phase of the sentencing process. Thus, once a jury finds unanimously and beyond a reasonable doubt, the existence of at least one statutory aggravating circumstance, the defendant becomes death eligible and *Ring*'s constitutional requirement of jury fact-finding is satisfied.[48]

In this case, the trial judge sentenced Zebroski under the 1991 version of § 4209, which did not require the jury to find the existence of a statutory aggravating circumstance unanimously and beyond a reasonable doubt. But the jury did meet the *Brice* standard, since it convicted Zebroski *unanimously and beyond a reasonable doubt* of, among other crimes, one count of felony murder under 11 *Del. C.* § 636(a)(2). A conviction under § 636(a)(2)–(7) establishes the existence of a statutory aggravating circumstance under § 4209(e)(2). In *Brice*, this Court held that § 4209(e)(2) satisfies *Ring*.[49] Thus, we conclude that the 1991 version of § 4209 is constitutional as applied to Zebroski.

## VI

The Superior court carefully considered Zebroski's allegations and correctly determined that each of Zebroski's claims were without merit. Zebroski has failed to demonstrate any error of law or abuse of discretion requiring reversal. Accordingly, we affirm the Superior Court's decision denying Zebroski's request for postconviction relief.

---

**44.** *Flamer v. State,* 585 A.2d 736, 758 (Del. 1990) (quoting *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986)).

**45.** 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**46.** 11 *Del. C.* § 4209

**47.** 815 A.2d 314 (Del.2003).

**48.** *Id.; Norcross v. State,* 816 A.2d 757 (2003); *Swan v. State,* 820 A.2d 342, 2003 Del. Lexis 222 (Del.Supr.).

**49.** *See also Norcross v. State,* 816 A.2d 757 (2003); *Swan v. State,* 820 A.2d 342, 2003 Del. Lexis 222 (Del.Supr.).