Robert W. JACKSON, III, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 622,2008.

Supreme Court of Delaware.

Submitted: March 2, 2011.
Decided: May 17, 2011.
Corrected: May 23, 2011.
Reargument Denied June 17, 2011.

8. 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

Thomas A. Foley and John S. Malik, Wilmington, Delaware; Billy H. Nolas (argued), pro hac vice, Philadelphia, Pennsylvania for appellant.

Elizabeth R. McFarlan (argued) and Gregory E. Smith, Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, Justices and NOBLE, Vice Chancellor.*

STEELE, Chief Justice.

In March 1993, a jury convicted Robert Jackson of first degree murder. In October 1995, after a second penalty hearing, the trial judge sentenced Jackson to death. This appeal follows a Superior Court judge's denial of Jackson's second Motion for Postconviction Relief. Jackson argues that sidebar commentary his attorney made to the trial judge during a pretrial hearing created an unlawful "appearance of impropriety," violated his due process rights, and denied his Sixth Amendment right to counsel. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

*Police Investigated A Murder And Arrested Jackson.*

On April 3, 1992, police recovered Elizabeth Girardi's dead body from her driveway. The apparent victim of a bungled burglary of her home, she died as the result of repeated blows to her face with an axe. Police began investigating the circumstances surrounding her death.

On April 9, two men—James Burton and Carl Roca—pawned a bracelet that had been stolen from Girardi's home. Police had warned pawn shop owners in the area to look out for certain pieces of property that had been stolen from the Girardi home, and when the shop owner recognized the bracelet, he contacted police. That day, police obtained warrants authorizing them to search Burton's and Roca's residences and take Burton and Roca into custody to obtain clothing, fingerprints, and hair and blood samples from them.

Police quickly learned that Burton was living with a man named Robert Jackson, and while conducting surveillance in the area around their apartment, police observed Burton and two other unidentified men drive away. The police stopped the car for two traffic violations. Anthony Lachette was driving the car, Jackson was in the front passenger seat, and Burton was in the backseat. Because the car only had two doors, in order for Burton to get out of the car, either Jackson or Lachette had to get out and fold their seat forward. When Lachette's driver door opened, police noticed a 14 inch metal pipe wedged between his driver's seat and the door. Then, when folding the driver's seatback forward to let Burton out of the car, police noticed a plastic bag of marijuana wedged into the space where the seatback and the seat cushion meet. Police arrested all three on concealed deadly weapon and marijuana charges.

That night, under police interrogation, Burton denied any knowledge of Jackson's involvement in Girardi's murder. Lachette, however, admitted to his personal involvement in the Girardi burglary, and he also implicated Jackson for murdering Girardi. Upon learning this information,

---

* Sitting by designation pursuant to Del. Const. Art. IV § 12.

police arrested Jackson for the Girardi burglary and murder. When police questioned Burton again nearly three weeks later, he corroborated Lachette's allegations regarding Jackson's role in the murder.

### A Grand Jury Indicted Jackson, A Jury Convicted Him, And A Judge Sentenced Him To Death.

On April 27, 1992, the New Castle County grand jury indicted Jackson for first degree murder, second degree burglary, first degree robbery, three counts of possession of a deadly weapon during the commission of a felony, second degree conspiracy, and felony murder. On July 6, 1992, Joseph Hurley formally entered his appearance as Jackson's attorney. On August 28, 1992, the Superior Court held a proof positive hearing at which Hurley represented Jackson. Then, on October 5, 1992, Hurley filed a Motion to Withdraw as Counsel, citing in his written motion the financial burden on Jackson's family of his continued representation of Jackson.

On November 10, 1992, the Superior Court held a hearing on Hurley's Motion to Withdraw. The circumstances of this hearing, which we explain in greater detail below, are the central issue in this appeal. On November 11, 1992, the judge granted Hurley's motion, and on November 16, the judge appointed new counsel for Jackson. This same Superior Court judge presided over all pre-trial, trial, sentencing, and re-sentencing proceedings in this case, as well as the first Rule 61 postconviction proceeding.

Beginning on March 16, 1993 the Superior Court held a nine day jury trial. At the conclusion of trial, the jury found Jackson guilty of all charges. On April 5, 1993, the Superior Court began a four day penalty hearing. At the conclusion of this penalty hearing, the jury unanimously found the existence of two statutory aggravating factors and recommended a death sentence by a margin of eleven to one. On April 28, 1993, the judge published his formal sentencing decision. In this opinion, the judge addressed independently the aggravating and mitigating factors pursuant to required statutory procedure. He concluded that the State had proven both statutory aggravating factors beyond a reasonable doubt and all twelve of its asserted non-statutory aggravating circumstances by credible and reliable evidence. He also found all eight of the defense's asserted mitigating factors by credible and reliable evidence. After weighing the aggravating factors against the mitigating factors, the judge imposed, among other sentences, one death sentence for each of Jackson's two murder convictions.

### The Delaware Supreme Court Affirmed His Convictions, But Reversed His Death Sentences And Remanded For A New Penalty Hearing Where The Judge Again Sentenced Him To Death.

Jackson appealed his convictions and death sentences. On July 15, 1994,[1] this Court affirmed Jackson's convictions, but vacated both death sentences. The United States Supreme Court denied the State's certiorari petition. On March 1, 1995, Jackson filed a Motion to Recuse the Superior Court judge who had presided over his original trial and penalty hearing, and to whom the case had been reassigned on remand. On March 22, 1995, the judge denied the recusal motion.

Starting on September 15, 1995, the Superior Court held a six day penalty hearing. According to standard protocol, the jury at this second penalty hearing consisted of different persons than those who constituted the jury at the first penalty

---

1. *Jackson v. State,* 643 A.2d 1360 (Del.1994).

hearing. At the conclusion of this penalty hearing, the jury, similar to the first, unanimously found the existence of two statutory aggravating factors and recommended death by an eleven to one vote. By Sentencing Order dated October 26, 1995, the Superior Court judge again addressed independently the aggravating and mitigating factors as the statute required. He concluded that the State had proven both statutory aggravating factors beyond a reasonable doubt and all eleven of its asserted non-statutory aggravating circumstances by credible and reliable evidence. The judge also concluded that Jackson had proven all eight of his asserted mitigating factors by credible and reliable evidence. After weighing the aggravating factors against the mitigating factors, the judge again imposed a death sentence for each of Jackson's murder convictions. On October 29, 1996, this Court affirmed the Sentencing Order, and on April 14, 1997, the United States Supreme Court denied Jackson's petition for a writ of certiorari.

***The Judge Denied Jackson's First Motion For Postconviction Relief, The Delaware Supreme Court Affirmed That Judgment, And The District Court Denied His Habeas Petition.***

Jackson filed his first Motion for Postconviction Relief on August 21, 1997. The Superior Court judge denied this motion on August 25, 1999, and this Court affirmed the denial on February 8, 2001. On August 13, 2001, Jackson filed a petition for writ of habeas corpus in the United States District Court. The District Court denied the petition on May 20, 2004, and the United States Court of Appeals for the Third Circuit affirmed this judgment on December 20, 2005.[2] On May 2, 2006, the Third Circuit denied Jackson's Motion to Recall its mandate. On October 2, 2006, the United States Supreme Court denied Jackson's petition for a writ of certiorari.

***Jackson Filed A Second Motion For Postconviction Relief, The Denial Of Which Is The Subject Of This Appeal.***

Jackson filed his second Motion for Postconviction Relief on October 19, 2006. A new Superior Court judge reviewed and decided this matter because the judge who had presided over all of Jackson's pre-trial, trial, sentencing, resentencing, and first postconviction proceedings retired before Jackson filed this motion. While this motion was pending in the Superior Court, Jackson filed a Motion for Leave to File a Successive Federal Habeas Petition in the Third Circuit. The Third Circuit denied this motion for leave on April 3, 2007. Jackson then filed a petition for writ of habeas corpus in the United States Supreme Court, which that Court denied on April 14, 2008. The Superior Court denied Jackson's second Motion for Postconviction Relief on November 25, 2008. Jackson now appeals this judgment.

After this Court heard oral argument, we remanded the case to the Superior Court and retained jurisdiction because the Superior Court did not address Jackson's argument that his death sentence violated his due process rights under *Gardner v. Florida*[3] when it denied his postconviction motion. The Superior Court addressed the *Gardner* issues and determined that they do not entitle Jackson to relief. We then asked the parties for supplemental briefing on his *Gardner* claim.

***Central Issue on Appeal.***

In this appeal, Jackson asks this Court to reverse the Superior Court's denial of his second Motion for Postconviction Re-

---

2. *Jackson v. Carroll,* 161 Fed.Appx. 190 (3d Cir.2005).

3. 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

lief. The relevant focus of Jackson's second Motion for Postconviction Relief is the November 10, 1992 Superior Court hearing regarding Hurley's Motion to Withdraw as Counsel. As earlier stated, in his written motion, Hurley cited the financial burden on Jackson's family of Hurley's continued representation as the reason for his desired withdrawal. At the hearing, however, Hurley asked the judge for leave to express an additional, unwritten reason at sidebar. Hurley expressed concern was that if his statement became public record and the press picked it up, it would compromise Jackson's right to a fair trial.

Whether Jackson knew what Hurley wanted to tell the judge is somewhat unclear from the cold record. When discussing whether a sidebar was appropriate, the judge and Hurley had the following exchange:

Judge: I presume the defendant knows about it?

Hurley: No, he does not.

Mere seconds later, however, the judge asked Hurley:

Judge: Does he have your permission to speak to the court without his knowledge?

Hurley: I've explained the difficulty to my client and I have his concurrence it may be said at sidebar.

The judge then asked Jackson directly whether he understood what was about to happen, and Jackson replied that he understood. Whether or not Jackson personally knew the content of Hurley's sidebar comments, it is undisputed and the record does not belie that Jackson's successor attorneys were not present at the sidebar, nor did they receive any prior indication of what Hurley was going to say.

What follows is the complete text of Hurley's commentary to the judge at sidebar:

Your Honor, I've been a defense attorney for seventeen years and I am able to divorce myself emotionally from what I hear in representing a client. There is one exception to that.

During the proof-positive hearing when I heard for the first time the graphic details that were given with regard to the victim in this case grabbing on to the handle of the axe with both hands while the defendant punched her with his free hand and she dropped to the ground, and then while she was writhing or spasming on the ground, then he struck her numerous times, instantly in my mind it brought back a circumstance where during the term of my marriage, my wife and I had a continual conversation regarding security at the house and the garage and her being in the garage.

At that moment, I felt an absolute sense of revulsion toward the defendant. I reached the conclusion in my mind he ought to die. I identified I would not sit with him at the table for the remainder of the hearing.

I met with him after that and I was supposed to meet with him that week and I delayed meeting with him because it was an emotional strain for me to have to meet with him.

Finally, weeks after I was supposed to meet with him I met with him. I found him to be distasteful. I had conversation with him about the state of the case. Without indicating what he said to me, the explanations that were given created emotional responses in me and I don't think it is fair to him.

I didn't put this in the motion because I thought it was prejudicial to him for an attorney to say in my estimation he's guilty and he ought to die. It's the only time it's happened in my life. But nonetheless, it is what it is.

At the end of the hearing, the judge granted Hurley's Motion to Withdraw. The judge also ordered the transcript of the hearing sealed. The hearing transcript was placed in a sealed envelope which apparently was filed in the Prothonotary's Office on or about July 20, 1993 and marked "psychological/psychiatric report." The sealed envelope also read "Sealed per order of the court." No one made Jackson's later trial and post-trial attorneys aware of the substance of Hurley's sidebar commentary. Not until some unknown later point, and for reasons that are unclear from the record, did the transcript of the sidebar become physically unsealed. In April 2006, the Federal Community Defender Office for the Eastern District of Pennsylvania—which had been assisting Jackson's Delaware counsel in connection with his second Motion for Postconviction Relief—reviewed the file in the Prothonotary's Office and first made note of the hearing transcript.

In this appeal, Jackson contends that Hurley's sidebar remarks tainted all future proceedings by unfairly biasing the judge, who ultimately sentenced Jackson to death. For support, Jackson likens his case to *Stevenson v. State*.[4] Jackson also alleges that the trial judge violated his due process rights by not *sua sponte* recusing himself, or, at a minimum, disclosing Hurley's commentary to later trial and appellate counsel. The judge who denied Jackson's second Motion for Postconviction Relief reasoned that Hurley's

comments did not deny Jackson his constitutional right to counsel, distinguished *Stevenson* and the other cases Jackson cited, and listed specific reasons supporting his conclusion that Hurley's comments did not taint the entire proceeding, or demand *sua sponte* recusal of the trial judge, or prejudice Jackson at trial or sentencing.[5] He characterized Hurley's comments as "improper, unprofessional, unbecoming a member of the Delaware Bar, and most troubling ...," but concluded that they did not ultimately undermine the reliability of the proceedings and did not entitle Jackson to relief because they did not prejudice him adversely.

## II. STANDARD OF REVIEW

 We review a Superior Court judge's decision on an application for postconviction relief for abuse of discretion.[6] We review issues arising under the United States or Delaware constitutions *de novo*.[7] We also review claims relating to the appearance of judicial impropriety *de novo*.[8]

## III. ANALYSIS

Distilled to their essence, Jackson's claims in this appeal are that: (1) an unlawful "appearance of impropriety" taints this entire proceeding and entitles him to relief under *Stevenson*, (2) his death sentence violates his due process rights under *Gardner*, and (3) Hurley violated Jackson's Sixth Amendment right to counsel. We address each in turn.

---

4. 782 A.2d 249 (Del.2001).

5. Among these reasons, the judge cited the fact that Hurley made the comments four months before trial, the judge permitted Hurley to withdraw moments after making his comments, Hurley's commentary occurred before an experienced judge and not a jury, and there is no evidence that the comments had any effect on the proceedings, including

the death sentence which followed an 11–1 jury recommendation.

6. *Gattis v. State*, 955 A.2d 1276, 1280–81 (Del. 2008).

7. *Hall v. State*, 788 A.2d 118, 123 (Del.2001).

8. *Stevenson v. State*, 782 A.2d 249, 255 n. 2 (Del.2001).

## A. *This Case is Critically Different From Stevenson, and Reliance on Stevenson is Misplaced.*

Jackson analogizes the circumstances of his case to those in *Stevenson v. State,* and argues that on the basis of *Stevenson,* we should reverse his death sentence and grant him a new penalty hearing. We believe the two cases are meaningfully different.

### 1. In *Stevenson,* We Granted A New Penalty Hearing Because Of An Unacceptable "Appearance of Impropriety."

A grand jury indicted Stevenson for first degree murder, among other charges, for his role in the death of a witness scheduled to testify against him in an unrelated theft case. A jury convicted Stevenson on all charges. After a penalty hearing, the jury unanimously found four statutory aggravating circumstances, voted eight to four that the aggravating circumstances outweighed the mitigating circumstances and recommended a death sentence. In what this Court described as an "extensive written opinion," [9] the trial judge sentenced Stevenson to death.

On his direct appeal, Stevenson argued that the trial judge should have recused himself because he had conducted a suppression hearing in the theft case against Stevenson during which he heard the murder victim testify. This Court rejected that claim under a plain error standard of review, because the judge's familiarity with the victim resulted entirely from a judicial, rather than extrajudicial, source and recusal was therefore not required.

Stevenson then filed a Rule 61 petition for postconviction relief. One of the grounds for his postconviction claims of ineffective assistance of counsel was that his trial attorney failed to file a motion for recusal based on the appearance of partiality. The same judge who had presided over Stevenson's trial denied Stevenson's petition for postconviction relief without granting an evidentiary hearing. Stevenson then appealed that judgment to this Court.

We remanded the case to the Superior Court for development of the factual record. Specifically, we requested a report from the President Judge of the Superior Court detailing the general standards governing the assignment of judges to capital cases and commenting specifically on the assignment in Stevenson's case. We also requested a report from the trial judge explaining his involvement in the suppression hearing in Stevenson's unrelated theft case and the circumstances of his assignment to Stevenson's capital case.

Both reports revealed, for the first time on the record, that the trial judge had requested, directly from the President Judge, to be assigned Stevenson's capital case. In his report on remand, the trial judge characterized the circumstances in this way:

> At the time of my request, I had no pending capital murder trials. President Judge Ridgely strives to divide murder cases equally among the judges and, quite naturally, considers volunteers in assigning high profile cases. I volunteered for two reasons. First, I had no capital cases assigned to me at the time, and second, I was familiar with the facts surrounding the [ ] theft case.
>
> . . .
>
> My familiarity with the theft case did not induce me to prejudge Stevenson [ ] on the murder charge[ ].[10]

---

9. *Id.* at 252.

10. *Id.* at 254.

The parties, like this Court, had never known about the trial judge's specific assignment request before the trial judge filed this report on remand.

We reversed the Superior Court judgment on the basis that the circumstances of the trial judge's conduct in *Stevenson* created an unacceptable "appearance of impropriety." We also remanded the case, mandating that a new Superior Court judge consider Stevenson's postconviction claims relating to the guilt phase of his trial and conduct a new penalty hearing. Specifically, we stated: "[T]he appearance of partiality evident in this case creates too great a risk that a constitutional violation has occurred in the imposition of the death penalty." [11]

### 2. Inquiries Regarding Judicial Impartiality Are Case Specific.

■ Canon 2 of the Delaware Judges' Code of Judicial Conduct admonishes generally that a judge should avoid both impropriety and the appearance of impropriety.[12] The Code of Judicial Conduct also instructs judges to avoid participation in proceedings by disqualifying themselves whenever "the judge's impartiality might reasonably be questioned." [13] A judge may act in utmost good faith, yet nevertheless an appearance of impropriety may still arise.[14] Any inquiry into the question of whether a judge's impartiality might reasonably be questioned is case specific.[15]

Under Delaware's capital punishment procedures, a jury must find the existence of at least one aggravating circumstance beyond a reasonable doubt and determine by a preponderance of the evidence whether the aggravating circumstances outweigh the mitigating circumstances.[16] The jury vote on each question, however, is only a recommendation to the sentencing judge, who must engage in the same analysis and independently exercise ultimate sentencing responsibility.[17] Because the "ultimate fixing of the sentence is in the hands of the trial judge," the risk that injustice might arise from a judge participating in a proceeding despite the appearance of partiality is particularly acute in a capital murder prosecution.[18]

■ The standard in "appearance of impropriety" cases is objective. In that context, we must not examine whether or not the trial judge was actually influenced by bias. Instead, we examine whether his conduct "created the unacceptable risk that a reasonable observer would so conclude." [19]

### 3. The Circumstances In This Case Create Insufficient "Appearance of Impropriety" To Support Reversal Of Jackson's Death Sentence.

■ The circumstances surrounding Jackson's death sentence are meaningfully different from those in *Stevenson,* and yield a different outcome. In *Stevenson,* several circumstances were particularly critical to our holding. First, and perhaps most important, the trial judge took the affirmative act of requesting Stevenson's capital case even before the grand jury

---

11. *Id.* at 260.

12. Del. Judges' Code of Judicial Conduct Canon 2.

13. *Id.* at Canon 3C.

14. *Stevenson,* 782 A.2d at 256.

15. *Id.* at 258.

16. *Id.*

17. *Id.* at 259.

18. *Id.* at 258.

19. *Id.*

indicted Stevenson, and never disclosed that request to the parties until the case was on remand after denial of postconviction relief. In our opinion on appeal, we explained that "[t]he willingness of a judge to accept an assignment carries no implication of impropriety, but a trial judge's initiation of the request for assignment may raise questions concerning motivation."[20] This request was particularly problematic because the trial judge had had earlier contact with the victim.[21]

Also important, we found that the trial judge, in his written sentencing opinion, had demonstrated "obvious" strong emotions about the murder.[22] Specifically, we wrote that:

> While the trial judge's repulsion at the killing of an innocent witness is understandable, his sentencing findings carry a tone of personal affront. In the context of a capital punishment case, this is troubling, particularly when viewed in light of the trial judge's personal request for assignment of the [ ]Stevenson murder case[ ] even before the defendant[ ] [was] indicted.[23]

These circumstances, combined with a jury vote recommending death by only an eight to four margin, and with no other factors affirmatively indicating a lack of bias, led us to conclude that "the decision to impose capital punishment [was] subject to serious question."[24] We remanded for a new penalty phase hearing with a different judge.

The relevant circumstances in Jackson's case are critically different. In *Stevenson*, the trial judge affirmatively requested the capital case. Here, the trial judge in this case had Hurley's unsolicited commentary thrust upon him without forewarning. In this case, the trial judge had no previous interaction with the murder victim—judicial or otherwise. In *Stevenson*, approximately 13 months passed between the trial judge's request for the case and his final sentencing opinion. In this case, nearly three years separated Hurley's comments from Jackson's final sentencing. Whereas in *Stevenson*, the jury at the penalty phase recommended a death sentence by an eight to four vote, in this case two different juries after two different penalty phases each recommended death by an eleven to one vote. The judge's final sentencing opinion in this case did not include language evincing a "tone of personal affront" similar to that in *Stevenson*.

We also note other circumstances that affirmatively suggest a lack of bias on the part of the trial judge in this case. First, in his second sentencing opinion, the trial judge found fewer non-statutory aggravating factors than he found after the first sentencing phase. Also, the trial judge's decision to seal the transcript of Hurley's comments was protective of Jackson's right to a fair trial; had the media gotten wind of Hurley's sidebar commentary, sensational reports could have easily tainted the jury to be empanelled.

We are acutely sensitive to the special scrutiny capital cases merit on review. Nevertheless, we believe it is important to note an important practical reality of our judicial system that we believe is relevant to this case. As a necessary consequence

---

20. *Id.* at 257.

21. *Id.* ("Under the unusual circumstances now revealed, we are forced to conclude that the trial judge should not have requested the murder case assignment prior to indictment *in view of his prior contact with the victim* in the suppression hearing.") (emphasis added).

22. *Id.* at 259.

23. *Id.*

24. *Id.*

of their evidentiary gatekeeping function, trial judges hear, see, and make judgments about inadmissible evidence regularly. That is equally true for bench trials, where the judge sits as both arbiter of law and factfinder, and for jury trials. For that matter, trial judges instruct juries—and assume they are able—to disregard inadmissible evidence that, despite the gatekeeper's efforts, the jury still sees and hears. To be sure, review mechanisms exist to protect defendants in cases where the fact finder hearing of inadmissible evidence is so prejudicial as to create an unacceptable "appearance of impropriety" that could test reasonable lay persons' trust in the judicial system. But, although the "appearance of impropriety" standard is a potent tool, it does not invalidate judicial conduct in every instance. This case illustrates that point.

Taking into account all the relevant circumstances in this case—the trial judge's unsolicited, passive receipt of Hurley's opinion, the lack of any previous contact between the judge and the victim, the significant time span between Hurley's commentary in November 1992 and the final sentencing in October 1995, the fact that the judge's sentencing decision relied heavily on the jury's recommendation and that two different juries had each recommended death by an eleven to one vote, the judge's nonuse of language suggesting "personal affront," and the affirmative steps the judge took demonstrating a lack of bias—we do not find an unacceptable risk that a reasonable observer would believe that bias influenced this trial judge. The relevant circumstances do not disclose any "appearance of impropriety" sufficient to reverse the Superior Court judgment and grant a new penalty phase.

## B. *Jackson's Reliance On Gardner Is Also Misplaced.*

Jackson also contends that his death sentence violates due process under the United States Supreme Court's holding in *Gardner v. Florida.* We disagree because there is no evidence on this record that the trial judge relied at all on Hurley's sidebar commentary when imposing Jackson's death sentence.

### 1. A Fractured Supreme Court In *Gardner* Overturned A Death Sentence Because The Sentencing Judge Relied On Information Unavailable To Defense Counsel.

A jury found Gardner guilty of first degree murder in Florida on January 10, 1974.[25] Florida, like Delaware, requires a separate penalty hearing in capital cases where a jury must determine whether the State had proven statutory aggravating circumstances, whether mitigating circumstances outweigh aggravating circumstances, and whether the defendant should be sentenced to life imprisonment or death. After the jury retired to deliberate, the sentencing judge announced that he was going to order a presentence investigation of Gardner.[26] After twenty-five minutes of deliberation, the jury expressly found that the mitigating circumstances outweighed the aggravating circumstances and advised the judge to impose a life sentence.[27]

The Florida Parole and Probation Commission completed its presentence investigation of Gardner and issued a presentence report on January 28, 1974.[28] Two days later, the trial judge entered findings

25. *Gardner,* 430 U.S. at 352, 97 S.Ct. 1197.

26. *Id.*

27. *Id.* at 353, 97 S.Ct. 1197.

28. *Id.*

of fact and, contrary to the jury recommendation, sentenced Gardner to death.[29] He explicitly based his judgment on "the evidence presented at both stages of the bifurcated proceeding, the arguments of counsel, and his review of the factual information contained in said pre-sentence investigation."[30]

The presentence investigation report had a confidential portion that the judge never disclosed to defense counsel.[31] Defense counsel and the State each received copies of the non-confidential portions of the report, and defense counsel did not ask to see the full report or to be appraised of the substance of the confidential portion.[32] The Supreme Court, by a fractured majority, vacated Gardner's death sentence and remanded. The plurality written opinion based this judgment on its belief that Gardner "was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain."[33]

### 2. Jackson's *Gardner* Claim Fails Because There Is No Record Evidence That The Judge Relied On Hurley's Comments When Sentencing Jackson.

■ In *Gardner*, the judge's reliance on the confidential information as a basis for imposing the death penalty was centrally important.[34] Nevertheless, the plurality written opinion implicitly recognized that judges, consistent with their gatekeeping function, have the intellectual capacity to be exposed to disputed information and disregard it in the exercise of their judicial function.[35] In so doing, the *Gardner* plurality affirmed that the critical aspect of its decision was not the trial judge's exposure to confidential information, the nature of that information, or the fact that the parties arguably would have disputed the information, but rather that the case record established that the judge relied, at least in part, on that information when imposing the death sentence.

In Jackson's case, there is no record evidence that the trial judge relied on Hurley's sidebar comments at all. He permitted Hurley to withdraw as Jackson's attorney at the end of the pretrial hearing, and he sealed the transcript so that no one else could read Hurley's unfavorable opinion of Jackson and risk Jackson's right to a fair trial. And, there is no evidence that when the trial judge imposed the death sentence nearly three years later, he either reviewed or relied in any way on Hurley's commentary. In fact, his finding at the second penalty hearing of one less aggravating factor than he found at the first penalty hearing affirmatively shows that he was not relying on Hurley's strong negative opinion while sentencing Jackson. As the judge stated in his sentencing opinion, he relied on evidence from the trial and second penalty hearing, the arguments

---

29. *Id.*

30. *Id.* (quoting court filings) (internal quotation marks omitted).

31. *Id.*

32. *Id.*

33. *Id.* at 362, 97 S.Ct. 1197.

34. *See id.* ("We conclude that petitioner was denied due process of law when the death sentence was imposed, at least in part, *on the basis of* information which he had no opportunity to deny or explain.") (emphasis added).

35. In direct response to the State's argument that full disclosure of the disputed information would unnecessarily delay the proceeding, the plurality wrote: "In those cases in which the accuracy of a report is contested, the trial judge can avoid delay by disregarding the disputed material." *Id.*

of counsel, and, in particular, the eleven to one death recommendation of the penalty phase jury.[36]

Without record evidence proving reliance on Hurley's remarks, the judge in this case did not violate Jackson's due process rights under *Gardner*. Therefore, we reject Jackson's claim for relief on the basis of *Gardner*.

### C. Because Jackson Has Not Established Prejudice And We Do Not Presume It, Jackson Was Not Denied His Sixth Amendment Right To Counsel.

Two United States Supreme Court cases, espousing divergent rules for divergent circumstances, embody the law of ineffective assistance claims.[37] Jackson cursorily invokes both cases to support his argument that Hurley's conduct denied him his Sixth Amendment right to counsel.

Jackson argues that we should presume unlawful prejudice under *United States v. Cronic* because Hurley failed to function as a meaningful adversary to the State.[38] In *Cronic*, the Supreme Court instructed that because we presume a lawyer is competent, the burden generally rests on the accused to demonstrate the constitutional violation of ineffective assistance. The Court clarified, however, that

in certain circumstances the likelihood of prejudice is so great that they give rise to a presumption of unlawful prejudice.[39] These situations are: (1) the complete denial of counsel at a critical stage of trial, (2) an entire failure by counsel to subject the prosecution's case to meaningful adversarial testing, and (3) cases where counsel must provide effective assistance under circumstances where no fully competent lawyer would likely be able to provide effective assistance.[40] To warrant the *Cronic* presumption, an attorney's failure to carry out his adversarial function "must be complete." [41]

Alternatively, Jackson argues that even if we do not presume prejudice under *Cronic*, he has established prejudice and deserves relief under *Strickland v. Washington*,[42] because Hurley's commentary undermines confidence in the outcome of his trial and penalty hearing. In *Strickland*, the Supreme Court held that an ineffective assistance of counsel claim that does not rise to the "complete" failure discussed in *Cronic*, has two components. A defendant—here, Jackson—must show that his counsel was deficient, and that this deficient performance prejudiced his defense.[43] Mere allegations of ineffectiveness are insufficient; Jackson must make

---

36. *State v. Jackson*, Nos. N92–04–1222, N92–04–1223, N92–04–1224, N92–04–1225, N92–04–1226, N92–04–1227, N92–04–1348, N92–04–1349, slip op. at 2, 12 (Del.Super.Oct.26, 1995).

37. *See generally Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

38. *Cronic*, 466 U.S. at 658, 104 S.Ct. 2039.

39. *Id.*

40. *Id.* at 659–60, 104 S.Ct. 2039. Illustrative of the third situation, the Supreme Court cited *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct.

55, 77 L.Ed. 158 (1932), in which the trial court designated counsel on the opening day of a capital trial despite the attorney's statements that he had not had an opportunity to prepare the case or to familiarize himself with local procedure.

41. *Bell v. Cone*, 535 U.S. 685, 697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

42. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

43. *Id.*

specific allegations of actual prejudice and substantiate them.[44] This is true regardless of the reasonableness of counsel's error.[45]

In this case, we do not presume prejudice. Hurley's comments were made on a single occasion, during a pretrial hearing on his Motion to Withdraw as Counsel, and the judge permitted him to withdraw from the case at the end of the hearing. Jackson then received new counsel who represented him at all times during the trial, the appeal, and the post-trial proceedings, and he does not claim any failure by his later counsel. Because there is no "complete" failure of counsel, this case does not warrant the *Cronic* presumption of prejudice.

Nor has Jackson established actual prejudice sufficient to warrant *Strickland* relief. Jackson's specific contention of actual prejudice is that Hurley's sidebar commentary to the judge undermines confidence in the outcome of his trial and the imposition of his death sentence. We have already determined, however, that there is no evidence the judge relied, in any part, on that commentary when imposing the death sentence, and that Hurley's conduct did not create an unlawful "appearance of impropriety" sufficient to undermine confidence in the outcome of the trial or the sentence.[46] Accordingly, the circumstances of this case did not operate to deny Jackson his Sixth Amendment right to counsel.

## IV. CONCLUSION

The circumstances of this case are meaningfully different from those in *Stevenson* and *Gardner*. We, therefore, hold for the reasons detailed above, that neither *Stevenson* nor *Gardner* is an appropriate

basis to grant Jackson's claim for relief. We also hold that Hurley's commentary did not deny Jackson's Sixth Amendment right to counsel under either *United States v. Cronic* or *Strickland v. Washington.* Consequently, the judge who denied Jackson's second motion for postconviction relief, which precipitated this appeal, did not err in denying relief. The judgment of the Superior Court is affirmed.

---

44. *See Zebroski v. State,* 822 A.2d 1038, 1043 (Del.2003).

45. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

46. *See supra* Analysis parts I, II.