# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALLAN J. CAMAISA, as Seller's Representative for SHAREHOLDERS OF PARALLEL 6, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 2019-0561-NAC |
| | ) | |
| PHARMACEUTICAL RESEARCH ASSOCIATES, INC., a Virginia Corporation; and JOHN DOES 1-10, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: January 21, 2025
Date Decided: October 28, 2025

Julia B. Klein, KLEIN, LLC, Wilmington, DE; Attorney for Plaintiff Allan J. Camaisa

Stephen B. Brauerman, Elizabeth A. Powers, Sarah T. Andrade, BAYARD, P.A., Wilmington, DE; F.M. Haston III, BRADLEY ARANT BOULT CUMMINGS LLP, Birmingham, AL; Kim Martin, BRADLEY ARANT BOULT CUMMINGS LLP, Huntsville, AL; Samuel Acker, BRADLEY ARANT BOULT CUMMINGS LLP, Dallas, TX; Attorneys for Defendant Pharmaceutical Research Associates, Inc.

**COOK, V.C.**

This post-trial decision resolves the fraud and breach of contract claims of Plaintiff Allan Camaisa, as Seller's Representative for stockholders of Parallel 6, Inc. ("P6"), against Defendant Pharmaceutical Research Associates, Inc. ("PRA"). Plaintiff's claims arise out of PRA's 2017 merger with P6 ("Merger") and the parties' preceding negotiations. The parties effectuated the Merger via an Agreement and Plan of Merger ("Agreement"). Notably, the Agreement provided for a $40 million payment at closing and up to $10 million in contingent consideration if P6 hit certain revenue targets within eighteen months.

Plaintiff alleges PRA fraudulently represented during a March 28, 2017, oral conversation—for which there is no contemporaneous transcript or written summary—that P6 would operate autonomously from PRA after the Merger. Specifically, Camaisa asserts PRA's CFO assured him P6 could continue selling to PRA's competitors post-Merger. P6 allegedly relied on that purported representation in agreeing to the Merger and the Agreement's earnout provisions. Plaintiff also claims PRA breached the Agreement by knowingly undertaking post-Merger actions for the primary purpose of frustrating P6's achievement of the earnout.

After trial, the Court concludes Plaintiff has failed to prove its claims by a preponderance of the evidence. Accordingly, judgment is entered in favor of PRA and against P6 for the following reasons.

BACKGROUND

A. **P6 Before the Merger**

David Turner and Adam Halbridge founded P6 in 2009. Before the Merger, Camaisa served as P6's CEO, Turner as President, and Halbridge as the VP of Sales and Business Development.[1] P6 developed cloud-based technologies in the biopharmaceutical sector.[2] Specifically, P6 created software for the decentralized clinical trial ("DCT") industry, which allows patients to participate in clinical trials remotely.[3] Pre-Merger, P6's customers included a small number of clinical research organizations ("CROs") and biopharmaceutical companies.[4]

P6's flagship software, Clinical 6, was designed to show real-time data analytics concerning DCT patient enrollment, engagement, and management.[5] P6 designed another product, Site Startup, for a specific CRO,[6] PPD.[7] PPD sought to

---

[1] Tr. 5:16-6:17, 6:24-7:10, 7:22-8:10, 168:16-24, 170:16-171:6; PTO § 2, ¶¶ 2, 4. Citations to "Dkt." refer to the docket in this matter. Citations to "Tr." refer to the Trial Transcript. *See* Dkt. 145; Dkt. 146; Dkt. 147. Citations to "PTO" refer to the Joint Pre-Trial Stipulation and Order. *See* Dkt. 138. And citations to "JX" refer to the joint trial exhibits.

[2] Tr. 8:5-10.

[3] PTO § 2, ¶ 2; Tr. 8:24-9:22, 104:18-105:5,

[4] Tr. 9:17-9:22; *see* Tr. 396:21-397:9 (PRA executive characterizing P6's business before the Merger).

[5] PTO § 2, ¶ 3; Tr. 8:24-9:10; *see* Tr. 15:11-24 (discussing how Clinical 6 operates generally).

[6] CROs are "research organization[s] that actually provide clinical trial services for [] pharma." Tr. 9:23-10:3; *see* Tr. 390:18-391:4 ("you can think of CROs really as an adjunctive service to biopharmaceutical companies."). When a biopharma company wants to outsource its clinical trial work, it disseminates a request for proposals to CROs who submit bids for the contract. *See* Tr. 390:18-391:20. As such the CRO industry is highly competitive and CROs do not typically "work with each other" or "shar[e] technology or information[.]" Tr. 391:21-392:2.

[7] Tr. 17:17-18:2.

use Site Startup to help "start up [web]sites faster than they otherwise normally would at the beginning of . . . patient recruitment for [] clinical trial[s]."[8]

## B.    P6 and PRA Begin Discussing a Potential Acquisition

In 2016, Turner and Camaisa decided to sell P6 and hired an investment bank, H2C, to help explore potential transactions.[9]  Turner and Camaisa believed selling to a larger company would enhance product distribution and allow P6 to grow.[10]  P6 and H2C met with several companies to discuss possible deals.[11]  This included meeting with PRA's predecessor, PRA Health Science, a CRO with whom P6 had previously worked. [12]

From the outset, PRA expressed interest in acquiring P6.[13]  PRA's Executive VP of Scientific and Medical Affairs, Kent Thoelke,[14] felt merging with P6 would generate significant synergies—primarily "by incorporating [P6's] platform into [PRA's] full-service delivery model."[15]  PRA believed P6's software would provide "an end-to-end solution for [its] virtual environment model" and make PRA the first CRO

---

[8] Tr. 9:6-10.

[9] Tr. 10:12-15; PTO § 2, ¶ 5; *see* Tr. 94:16-19 (noting H2C acted as P6's investment banker).

[10] Tr. at 10:16-23.

[11] Tr. 10:23-11:18 (testifying P6 met with at least five other potential buyers, including several CROs).

[12] PTO § 2, ¶ 6; Tr. 11:19-12:17, 13:4-8; *see* JX39 (listing PRA as a CRO that had previously awarded P6 a contract).

[13] *See* Tr. 11:19-13:3; 392:13-393:21.

[14] PTO § 2, ¶ 9.

[15] Tr. 396:17-397:12; *see* JX11 (laying out Thoelke's vision for how PRA would integrate P6's software).  Thoelke communicated his vision concerning P6 and PRA's integration with Turner and Camaisa. *See, e.g.*, Tr. 399:7-20; JX23.

to "offer a full end-to-end virtual model" in the DCT sector.[16]  A fully virtual clinical trial model would give PRA a strategic advantage over competitor CROs.[17]  P6 and H2C believed a deal would benefit PRA, because P6's technology was a potential gamechanger in the industry, allowing PRA to capture market share.[18]

Although P6 received other expressions of interest,[19] it preferred PRA as an acquiror.[20]  P6 "wanted to get [its] product out to pharma," and PRA had relationships with major biopharmaceutical companies that P6 "c[ould]n't touch" on a standalone basis.[21]  Unlike P6, PRA had existing infrastructure to bring P6's technology to a broader market, including thousands of employees and a large sales division.[22]  P6 believed a deal with PRA could "significantly enhance [P6's] revenue pipeline" and result in a billion-dollar growth opportunity.[23]

---

[16] Tr. 455:21-456:8; *see* JX11.

[17] Tr. 398:2-399:1.

[18] JX13; JX41.

[19] Tr. 176:21-177:10; JX13.

[20] Tr. 180:8-11 (Camaisa testifying that "I did like PRA Health better, to be frank about it. So I kind of wanted [H2C] to work PRA more than I wanted to work [an alternative potential buyer].").

[21] Tr. 11:8-14, 26:13-22, 177:7-179:10, JX13.

[22] *See, e.g.*, Tr. 26:13-22, 179:1-10, 396:24-397:9.

[23] *See, e.g.*, Tr. 26:13-22, 179:1-10.

In late 2016, P6 and PRA began negotiating deal terms. Thoelke led PRA's deal team, which also included PRA's General Counsel, and Linda Baddour, PRA's then-CFO.[24] Turner and Camaisa led negotiations for P6.[25]

In December, PRA delivered a non-binding letter of intent to P6.[26] This initial LOI estimated P6's enterprise value at $25-35 million, and contemplated a transaction where PRA would pay $15-20 million at closing, with the remainder subject to an earnout.[27] Camaisa immediately resisted any earnout,[28] preferring to receive "more cash and ideally stock" upfront.[29] Camaisa knew PRA was "going to want to take over [P6] and run it their way" after any acquisition.[30] Thus, Camaisa expressed that for an earnout to make sense P6 would need to continue to "execute on initiatives with [PRA's] competitor CRO's [sic] post acquisition."[31]

Thoelke informed Turner that allowing P6 to continue selling to PRA's competitors would fundamentally undermine the deal's business justification—

[24] PTO § 2, ¶¶ 8-9; Tr. 518:11-23, 521:20-522:9.

[25] PTO § 2, ¶ 7; *see* Tr. 396:3-16.

[26] *See* JX14.

[27] *Id.*

[28] *See* JX18. Camaisa, an experienced businessperson, "was against an earnout" and considered including an earnout "stupid." *E.g.*, Tr. 173:19-174:14; JX02.

[29] JX18; Tr. 183:11-183:15; *see* JX13.

[30] Tr. 174:6-14, 175:10-24 (Camisa testifying that "I knew that full integration is probably going to happen and [PRA is] going to want it."); *see* JX02 (Camaisa writing that "[a]ny earn outs which we agree [to] is plain stupid" because "[a]ny 9th grader . . . will realize . . . [t]his cannot be a subsidiary or business unit where [PRA] want[s] to make sure [it] make[s] the 16M revenues to lose out on 300M in potential revenues by not having [P6] integrated into the entire company.").

[31] JX18; Tr. 183:23-184:9, 184:15-23. Yet, Camaisa "predicted [] in advance" that PRA would "tell [P6] not to sell to [its] competitors." Tr. 184:10-14.

5

namely allowing PRA to differentiate itself in the highly competitive CRO market and "take market share from competitor CROs *by offering something they couldn't.*"[32] Yet, Thoelke told Turner that P6 could continue "business that was in flight . . . in an RFP process" with other CROs.[33] Camaisa acknowledged that PRA restricting P6 from selling to other CROs would make triggering any earnout difficult.[34]

In February 2017, PRA and P6 executed a revised non-binding LOI.[35] Despite Camaisa's reservations, the updated LOI contemplated an upfront purchase price of $40 million and a contingent earnout payment of up to $10 million based on an undetermined revenue target.[36] Around this time, PRA internally discussed looking to "[o]perate P6 independently as a preferred vendor" before offering a "truly integrated solution."[37]

---

[32] Tr. 405:3-406:1 (emphasis added).

[33] *See, e.g.*, Tr. at 405:22-406:1, 459:15-460:10. "Work in flight" refers to preexisting business P6 had under existing contracts related to ongoing critical trials. Tr. 406:2-7. PRA would not ask P6 to stop these ongoing clinical trials for ethical and customer relationship reasons. Tr. 406:8-12.

[34] *See* JX27 ("If we were acquired, our numbers for Covance/Labcop [sic], PPD, Inventive would go away[.] We would have to emphasize, Pfizer, Sanofi, and GSK, and PRA strategic mid-long term objectives not in our original revenue projections. (still struggling about earnout) Perhaps you have some detailed suggestions at our next meeting"); Tr. 185:23-186:21, 423:14-17.

[35] PTO § 2, ¶ 14; JX119.

[36] JX119.

[37] JX48; *see* JX47.

## C.    Post-LOI Discussions and the March 28th Call

After executing the LOI, the parties continued discussions about the earnout and revenue target, while PRA conducted further diligence.[38]  H2C provided P6's financials to PRA and highlighted that revenue from other CROs was "at risk."[39]  PRA used that information to prepare projections for P6's post-merger financials.[40]  These PRA-generated projections removed P6 revenue from non-PRA CROs consistent with the parties' understanding that such revenue would trail off as the companies integrated.[41]  PRA used its projections to generate an earnout net revenue target of $30-35 million over an 18-month period.[42]  Yet, as P6 employees recognized, PRA's proposed earnout target did not account for the revenue lost from not selling to competitor CROs.[43]

After PRA conveyed its proposed earnout net revenue target, P6 attempted to negotiate for a lower figure.[44]  Camaisa reiterated his opposition to an earnout generally, and voiced concern that PRA's "[$]35.5 million" revenue target was "[v]ery

---

[38] PTO § 2, ¶¶ 15-16.

[39] JX43.

[40] *See* JX101 ("P6 revenue projections based on probability weighted 2017 pipeline report (*excluding CROs*)." (emphasis added)); JX106.

[41] JX101; *see* JX106; Tr. 620:8-11.

[42] JX61; JX62; JX70; JX71.

[43] JX76 (noting PRA "gave [P6] no discount for expected lost CRO revenue" when calculating the earnout threshold).

[44] JX78 at PRAHS255380; Tr. 189:22-190:19.

unrealistic."[45] Camaisa told Turner the earnout "[w]ould amount to zero," because P6 could not close large deals without his leadership.[46]

On March 28, 2017, Turner and Camaisa had a conference call with Baddour to discuss concerns about the proposed earnout revenue target (the "March 28 Call").[47] The record contains no written documentation of what occurred on the March 28 Call.[48] At trial, however, Turner testified the parties to the March 28 Call discussed "how [] [] P6 was going to operate independently" after merging with PRA.[49] Two days later, Camaisa emailed Baddour writing that "since PRA will own the company, PRA can do whatever they want" with P6.[50]

The same day, Thoelke internally circulated a "Position Support Paper" to PRA executives including Baddour.[51] The paper articulated the business case for the Merger.[52] Specifically, Thoelke posited how acquiring P6 would position PRA as an industry leader by "combin[ing] [] the P6 platform with PRAs data strategy."[53] Thus,

---

[45] Tr. 189:8-190:15.

[46] JX36. Additionally, Camaisa predicted P6 would "get slaughtered" with "custom builds" for PRA's large biopharmaceutical clients. *Id.*

[47] JX81; Tr. 22:24-23:14, 193:20-194:1.

[48] *See, e.g.*, Tr. 112:19-11:20.

[49] Tr. 124:23-125:3; *see* Tr. 194:2-195:4 (Camaisa testifying similarly about the substance of the March 28 Call).

[50] JX89. Camaisa provided several examples of how PRA could target its biopharmaceutical company clients. *Id.* Camaisa wrote that these examples "illustrat[ed] the faste[st] way to the earnout[.]" *Id.*

[51] *See* JX84.

[52] *See id.*

[53] *Id.* (noting "PRA historically ha[d] not centralized or brought in house any Patient Access or Engagement technology.").

8

Thoelke's support paper contemplated a "fully integrate[d]" P6-PRA "[v]irtual model" and did not mention P6 operating independently from PRA.[54]

In April 2017, Turner emailed Thoelke about P6's proposal for a research initiative called the Million Veterans Program.[55] For P6 to pursue the Million Veterans Program, it needed "a prime contractor already approved by the federal government."[56] Turner's email noted that several third parties, including Quintiles, another CRO, had contacted P6 about serving as prime contractor.[57] Turner asked whether Thoelke had "any guidance or thoughts on any of those [third] parties whom PRA may already prefer or not want us to work with."[58] In response, Thoelke forwarded the email to Baddour and PRA's CEO, writing that he was "tempted to" prevent P6 from working with "Quintiles[.]"[59] That statement was "in line with [Thoelke's] desire not to provide [P6's] product to competitor CROs."[60]

During the same month, PRA's executive team exchanged views on the scope of P6's integration over the first several months post-Merger.[61] Thoelke expressed

---

[54] *Id.*

[55] *See* JX96. As Thoelke explained at trial, "[t]he Million Veterans Program was an application using the [Clinical 6] platform to register and collect data for veterans who were participating in healthcare." Tr. 416:10-14.

[56] Tr. 416:15-24.

[57] JX96.

[58] *Id.*

[59] *Id.* At trial, Thoelke explained that he "was tempted just to lock out Quintiles from the bidding process, *given they were a competitor.*" Tr. 417:9-11.

[60] Tr. 417:12-16.

[61] JX97. *See also* JX47 (earlier discussions with PRA's IT department).

9

an understanding that P6 would "operate as a[n] 'independent' unit with regard to the Clinical 6 Platform for the near future."[62] Baddour stated she "underst[oo]d the need to leave the team to get on with their work but I also want a smooth integration with our current IT roadmap."[63]

On May 9, PRA management gave a presentation to PRA's board of directors concerning the Merger with P6 revenue projections "based on a . . . pipeline report (excluding CROs)."[64] The revenue projections contained line items for "P6 Revenue," "PRA Revenue Synergies," and "Total Revenue," and provided "IRR . . . on a combined basis."[65] At the meeting, PRA's board approved the Merger and authorized execution of the Agreement.[66]

## D.     The Agreement, Closing, and Post-Closing Integration

On May 10, the parties executed the Agreement for the Merger, which then closed the same day.[67] The Agreement provided for a $40 million closing payment and "Contingent Consideration" of $7 to $10 million if P6 reached a net revenue target of $23.8 to $34 million within eighteen months.[68] Turner, President of the post-

---

[62] JX97. Thoelke's position concerning P6's post-merger independence was driven by IT integration concerns, not any earnout or prior representation to Camaisa or Turner. *See id.* ("I think at this stage we don't have any idea how or what components would integrate into our IT roadmap.").

[63] *Id.*

[64] JX106; *see* Tr. 465:2-465:20.

[65] JX106.

[66] PTO§ 2, ¶19

[67] PTO § 2, ¶ 22; *see* JX112 ("Agreement").

[68] PTO, §2, ¶ 24.

Merger combined P6 entity, emailed senior PRA leadership to voice his excitement about "crushing the competition" with PRA.[69]

Two provisions in the Agreement are central to this action. Section 2.7(g)(i) provides that "[PRA] shall not knowingly take (or knowingly cause any of its controlled Affiliates to take) any action for the primary purpose of preventing the achievement of the Contingent Consideration."[70] Section 2.7(h) states:

> Subject only to the specific restrictions contained in Section 2.7(g), the Sellers Representative (on behalf of the Sellers) acknowledges and agrees that (i) Parent and its Affiliates will be entitled to effect the integration of the Surviving Corporation and its business, assets and personnel with Parent and its Affiliates, (ii) Parent and its Affiliates shall have the right to direct the overall operations and strategy of the business of the Surviving Corporation and may make all management decisions with respect to the Surviving Corporation and its business (including all decisions with respect to the research, development, marketing and sale of its products and services) . . . ."[71]

Thoelke began integration efforts immediately after the Merger closed. On the day of closing, Thoelke emailed Turner to schedule a meeting concerning "immediate

---

[69] JX108 at PRAHS0022398; PTO § 2, ¶23.

[70] PTO, §2, ¶25; Agreement § 2.7(g)(i).

[71] PTO § 2, ¶ 26; Agreement § 2.7(h). Section 6.6 provides, "[t]his Agreement (including any annexes, schedules and exhibits hereto and the other Transaction Documents constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties both written and oral, among the Parties, with the respect to the subject matter hereof." PTO § 2, ¶ 27; Agreement § 6.6. The Agreement does not contain an anti-reliance clause. Instead, Section 6.13, entitled "No Waiver or Limitation Relating to Claims of Fraud," provides that, *"[n]otwithstanding anything to the contrary contained in this Agreement,* none of the provisions set forth in this Agreement shall be deemed a waiver or other limitation by any Party of *any* right or remedy which such Party may have at Law or in equity against a Person based on *any* fraud." PTO, §2, ¶28; Agreement § 6.13 (emphasis added). Section 5.5(d) also expressly carves out fraud from the parties' bargain that indemnification serves as the exclusive remedy for claims based on the Agreement. Agreement § 5.5(d) (referencing indemnification as exclusive remedy "absent fraud" and waiver of claims except "claim based on or arising from fraud").

11

and short term needs . . . for integration."[72]   In June, Thoelke held an integration

meeting with top pre-Merger P6 executives.[73]   PRA identified biopharma companies

BMS and Takeda as "key client engagements," which Halbridge acknowledged "had

significant revenue-generating potential for P6 and warranted P6's primary focus."[74]

At the same time, PRA trained its global sales team on Clinical 6 and began including

the software in most of its proposals.[75]

   A couple months post-closing, Thoelke instructed employees to stop selling

Clinical 6 as a "stand alone solution."[76]   Turner understood Thoelke's email as a

direction that P6 "could no longer sell to [competitor] CROs, and [] [] no longer license

[Clinical 6] to pharma if PRA was not running the trial."[77]   Although Turner "didn't

like" Thoelke's instruction, he complied because Thoelke "was [his] boss."[78]   When

Thoelke later discovered P6 "w[as] attempting to sell to [] a CRO," he raised the issue

with Turner and reaffirmed "[P6] can't sell to CROs."[79]   Turner did not push back by

---

[72] JX110.

[73] JX128.  Meeting attendees included Jesse O'Gormon, Bratt Pruitt, and Halbridge.

[74] JX424 at ¶ 8.

[75] See, e.g., Tr. 437:11-14, 444:24-445:9, 541:9-12.  Thoelke emailed executives stating that "[w]e need to be clear – SALES PEOPLE should not be selling this [Clinical 6] [as a] standalone solution." JX132.

[76] JX132.

[77] Tr. 35:2-36:9.

[78] Tr. 36:24-37:3, 38:6:11.  In his conversations with Thoelke regarding the instruction not to sell to CROs, Turner did not mention any alleged promise by Baddour. See Tr. 37:4-38:5.

[79] Tr. 39:24-40:7.

pointing to a claimed pre-Merger promise regarding P6's post-Merger autonomy; instead, Turner apologized and admitted that it "shouldn't have happened."[80]

## E. PRA Scales Back P6's Software After Poor Performance Post-Closing

As the parties anticipated pre-Merger, PRA's post-closing efforts resulted in overwhelming deal flow for P6.[81] Thoelke noted, "[P6] ha[s] never seen this type of volume—nor had the added pressure of delivery expectations that our clients will [put] on them."[82] PRA asked P6 to develop a resource plan so it could execute on existing and anticipated work while still delivering high quality products.[83] Those efforts had little success.

In September 2017, O'Gorman confirmed that "project timeline and product quality issues [were] popping up daily" for P6, and Thoelke's requested "resource planning" remained an open item.[84] PRA began receiving complaints from its large pharmaceutical clients concerning P6.[85] For example, Sanofi complained that "basic things don't work" in P6's deliverables, asking if P6 had prior experience with clinical

---

[80] Tr. 40:7-9.

[81] *See* JX166.

[82] *Id.*

[83] *Id.*; JX152.

[84] JX168. To increase efficiency, the integration team created a "go/no go" checklist to tailor P6's inclusion in ongoing proposals. JX424 ¶ 9. At the same time, Halbridge, head of sales and business development for P6 post-Merger, terminated one of P6's internal salespeople who "never met or c[a]me close to meeting sales targets [P6] . . . set for him." JX167; *see* Tr. 633:11-20 (Halbridge testifying concerning the firing of another P6 salesperson whose performance "was less than our expectations.").

[85] *See, e.g.*, JX170.

13

trials and adding it was "embarrassed to roll out these apps."[86] Sanofi told PRA that

P6's technology "would be better for designing apps for lawn mowers etc."[87] Similarly,

BMS informed PRA it would not approve P6 for its services.[88] When Thoelke pressed

for an explanation,[89] BMS responded that its concern was P6's performance and

assurance of delivery.[90] These complaints prompted Thoelke to schedule a call with

P6 to analyze its pipeline, develop resource planning, and establish targets to help

P6 staunch the issues.[91] Thoelke continued to work with P6 toward meeting resource

needs and timelines as well as performance.[92] At this point, PRA had shelved Site

Startup in favor of its own software and P6 was focusing on Clinical 6.[93] But more

issues arose in 2018.

---

[86] *Id.*

[87] JX182.

[88] JX183.

[89] JX185.

[90] *Id.* Thus, while Thoelke's offered a price concession, that was not enough to get BMS on-board with P6.

[91] JX209. PRA executives discussed "slow[ing] [P6] down" and not accounting for any material revenue for P6 in PRA's Q4 financials to be "conservative." JX201.

[92] JX275 ("We have an incredibly exciting future ahead of us—but we just need to get the fundamentals in place so our foundation is strong and will enable and support growth and expansion").

[93] JX229. PRA preferred its own software, PSO, because it is "web-based." *Id.* PPD's termination of its exclusive licensing agreement with P6 also informed the decision to shelve Site Startup. *See* JX125; Tr. 17:17-18:2 (noting P6 specifically developed Site Startup for PPD). *See also* JX116 (stating PRA initially intended to "mov[e] forward" with Site Startup post-Merger).

14

In February 2018, Sanofi requested a meeting with PRA to address ongoing concerns with P6.[94] Sanofi had engaged in "a series of escalations," such that its procurement team planned to present the "timeline and financial impacts" of P6's shortcomings and "ask that [PRA] share [associated] costs."[95] The Sanofi meeting prompted PRA to pause including P6 in new proposal requests.[96] Similarly in May, another biopharmaceutical client, Paratek, flagged issues with Clinical 6.[97] Paratek identified "performance issues in the test environment," "concerns over the quality of the application and the experience," "poorly written" scripts, and a lack of "complete instructions."[98] Thoelke told Turner, "[t]his is . . . ruining credibility—after Sanofi I would have expected this would have gone very well. It concerns me that we have sold this to BMS and I'm even less inclined to include on Gilead unless I can get a plan in place to fix these errors."[99]

Around this time, Thoelke concluded P6's Ruby on Rails coding infrastructure needed to be replaced with a more modern language, so P6 could configure trials "more quickly and deliver on our timelines."[100] Some P6 executives agreed,

---

[94] JX307.

[95] *Id.* Specifically, Sanofi requested a "[$]1.5M refund for undelivered work." JX317.

[96] PTO § 2, ¶ 31; *see* JX319. PRA had already included P6 in over fifty outstanding proposals, and Thoelke "want[ed] to ensure that we have the resources and capability to deliver that work." JX319.

[97] JX373.

[98] *Id.*

[99] *Id.*

[100] *Id.*; *see* Tr. 448:18-23.

expressing "imminent concern that the business could collapse if [P6] didn't [change its coding language]."[101] Turner, however, resisted changing P6's coding language.[102]

## F.     Revenue Declines, Turner Departs, and P6 Misses the Earnout

Unsurprisingly, PRA's scaling back of P6 in the wake of customer complaints impacted revenue. In preparing its 2017 Form 10-K, PRA decided to release P6's earnout liability because the combination of P6's actual 2017 revenue and budgeted 2018 revenue was less than $15 million, $8.3 million short of the minimum earnout threshold.[103] PRA's auditors at Deloitte & Touche approved that decision.[104]

Turner then requested a formal meeting with Thoelke to discuss items he believed were hindering P6's ability to achieve the earnout.[105] Turner also forwarded a complaint letter from Camaisa and other P6 stockholders.[106] Thoelke was largely non-responsive, but concluded Turner "had a completely different vision for the way the product should be built."[107] In July 2018, Thoelke informed P6 and PRA that Turner was "exiting the organization."[108] Camaisa was appointed Seller's Representative in January 2019.[109]

---

[101] Tr. 449:11-14.

[102] Tr. 448:23-24; *see* Tr. 430:23-24.

[103] JX305; JX428; Tr. 593:19-22; PTO, §2, ¶ 29.

[104] JX301.

[105] PTO § 2, ¶¶ 32-33; JX345.

[106] JX361; JX349; Tr. 449:15-19.

[107] JX349; *see* JX352; Tr. 449:15-19.

[108] JX390.

[109] PTO § 2, ¶ 39.

P6's final earnout revenue for the eighteen months after the Merger closed was approximately $10 million.[110] Therefore, PRA did not pay P6 any earnout under the Agreement's terms.[111] This prompted Plaintiff to commence this action in July 2019.

## STANDARD OF REVIEW

A party asserting either fraud or breach of contract must prove its claim by a preponderance of the evidence.[112] A preponderance of the evidence means "proof that something is more likely than not."[113] In a bench trial "the judge sits as both arbiter of law and factfinder."[114] As factfinder, the Court determines witness credibility, can accept or reject specific testimony, and evaluates conflicting evidence.[115]

## ANALYSIS

### A.    Plaintiff's Fraud Claim

Plaintiff alleges Defendants fraudulently induced P6 to sign the Agreement and enter the Merger by falsely representing P6 would operate as a stand-alone entity

---

[110] *Id.* ¶ 38, JX407.

[111] PTO, §2, ¶ 38, JX407. ICON acquired PRA in 2021 for an estimated $12 billion and continues to use P6 technology, albeit with Java coding infrastructure. PTO §2, ¶¶ 40-41; JX419; Tr. 345:15-23, 452:12-453:3.

[112] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *12 (Del. Ch. Aug. 2, 2023) ("Each element of fraud must be proven by a preponderance of the evidence."); *Kuramo Capital Management, LLC v. Seruma*, 2024 WL 1888216, at *29 (Del. Ch. Apr. 30, 2024) ("A party seeking to enforce a contract must prove each element of its breach of contract claim by a preponderance of the evidence.").

[113] *Agilent Techs, Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010).

[114] Jackson v. State, 21 A.3d 27, 38 (Del. 2011).

[115] *Movora LLC v. Gendreau*, 2025 WL 2502457, at *7 (Del. Super. Aug. 29, 2025) (citations omitted); *see Unico Commodities, LLC v. Lofty Links, LLC*, 2025 WL 638631, at *4 (Del. Super. Feb. 25, 2025) (the Court "retains discretion to determine which evidence deserves more weight.").

17

and sell to competitor CROs in the eighteen months post-closing.[116]  To prevail on that claim, Plaintiff must establish:

> (1) [] defendant[s] made a false representation; (2) [] defendant[s] knew the representation was untrue or made the statement with reckless indifference to the truth; (3) defendant[s] intended for the plaintiff to rely on the representation; (4) [] plaintiff justifiably relied on the representation; and (5) [] plaintiff suffered causally related damages.[117]

Plaintiff's fraudulent inducement claim fails, because the trial record does not prove Defendants made a false statement by a preponderance of the evidence.[118]  Yet even if Plaintiff had proven a false statement, evidence shows a lack of justifiable reliance.

### 1.  Plaintiff Did Not Prove an Actionable False Statement

Plaintiff argues Baddour knowingly misrepresented on the March 28 Call that P6 could independently sell to competing CROs during the earnout period.  That supposed misrepresentation allegedly induced P6 to enter into the Agreement and accept the earnout provision therein.  As discussed, there is no contemporaneous record of what was said on the March 28 Call.  Therefore, I rely on the evidence following the call, as well as the trial testimony, to discern whether Baddour made the alleged misrepresentation.

---

[116] Dkt. 34 ¶¶ 71-78.

[117] *Vichi v. Koninklijke Philips Electronics, N.V.*, 85 A.3d 725, 807 (Del. 2014).

[118] *See Oracle Partners, L.P. v. Biolase, Inc.*, 2014 WL 2120348, at *19 (Del. Ch. May 21, 2014) (concluding a fraud claim failed "for want of a valid premise: [defendant] did not make any false statements or omissions.").

I first note that the Agreement's text directly contradicts the statements Baddour allegedly made on the March 28 Call. Rather than reference P6's alleged ability to operate as a quasi-independent entity, the Agreement states:

> (i) [PRA] and its Affiliates will be entitled to effect the integration of [P6] and its business, assets and personnel with [PRA] and its Affiliates, (ii) [PRA] and its Affiliates shall have the right to direct the overall operations and strategy of the business of [P6] and may make all management decisions with respect to [P6] and its business (including all decisions with respect to the research, development, marketing and sale of its products and services)[.][119]

This language empowers PRA to make all managerial decisions concerning P6 post-Merger, including restricting to whom P6 could sell its products or integrating P6's with PRA.[120] Based in part on this provision, Halbridge testified he (1) "underst[oo]d[] that, after the [Merger] with PRA closed, PRA would own and control P6"; (2) "did not believe P6 would operate independently of PRA"; and (3) "understood that PRA and its management would have the right to direct P6[] sales efforts."[121]

---

[119] *Id.* § 2.7(h). Plaintiff retorts that the Agreement did not specifically prohibit P6 from selling to PRA's CRO competitors post-Merger, but this too is unpersuasive given the Agreement's express grant of sweeping managerial authority to PRA. *See id.* (explicitly providing PRA "shall have the right to . . . *make all management decisions with respect to the . . . sale of [P6's] products and services.*" (emphasis added)).

[120] *See Paperless Solutions Group, Inc. v. MIB Group, Inc.*, 2025 WL 1466603, at *4 (Del. Super. May 21, 2025) (holding similar contractual language "grant[ed] [buyer] absolute discretion to determine" how to operate the acquired business).

[121] Tr. 616:17-25, 624:16-625:7; JX424. As a P6 stockholder, Halbridge would be entitled to a portion of the recovery if Camaisa prevails in this action. Tr. 616:20-24. This bolsters his credibility as his statements are, to some degree, against his interest. *See Outten v. State*, 650 A.2d 1291, 1297 (Del. 1994) ("self-inculpatory statements are inherently reliable and trustworthy." (internal quotes omitted)). That said, Halbridge is also a current employee of non-Party ICON, which acquired PRA after the events at issue. *See* Tr. 617:5-8. I accordingly consider and weigh Halbridge's testimony alongside the other evidence presented at trial, which I find ultimately compels the same conclusions.

19

Camaisa, an experienced and sophisticated party,[122] contractually agreed that PRA could integrate P6's business, direct P6's operations, and make all decisions regarding P6 sales.[123] During the early- to mid-Merger negotiations, Camisa was intensely focused on preventing inclusion of an earnout, which he had been "against" from the beginning.[124] Camaisa unquestionably knew of the earnout's eventual agreed-upon inclusion and its triggers. And concerns notwithstanding, Camaisa executed the Agreement, a mere month after his March 28 Call with Baddour during which she purportedly made representations regarding P6's supposed independence. Thus, the Agreement's plain terms severely undermine Plaintiff's arguments concerning the substance of the March 28 Call and whether P6 believed it would operate autonomously after the Merger with respect to CRO sales.[125]

---

[122] Indeed, it was notable at trial how often Camaisa emphasized his experience and business acumen. *See* Tr. 169:1-170:12 (Camaisa discussing his business experience), 174:8-9 ("I just knew it as a CEO. As a CEO, I know how CEOs think."), 175:10-11 (similar), 184:10-14 (similar), 187:5-8 (similar), 196:15-17 (similar). Camaisa testified that he had specific "experience [] growing businesses and selling them to public companies," such that he knew how the process went and things to avoid. Tr. 169:1-3; *see* Tr. 173:23-174:1 ("my first two companies I sold, I had no earnout. I knew better. No earnout.").

[123] *See* Agreement at Signatures. Although Camaisa felt the Agreement was "sloppy" he nevertheless signed and "took responsibility for it . . . as the CEO[.]" Tr. 229:13-231:1.

[124] *See* Tr. 173:23-174:4 ("I was against an earnout . . . Q. Do you remember saying that an earnout would be stupid? A. Yes."); JX2 (November 1, 2016, email in which Camaisa wrote, "Any earn outs which we agree [to] [are] plain stupid[.]"); JX13 (December 21, 2016 email in which Camaisa expressed skepticism regarding any earnout).

[125] This conclusion is not inconsistent with the Court's prior ruling on Defendant's Motion for Partial Summary Judgment. As noted therein, for purposes of the motion, "[D]efendant [was] not contesting that Baddour made the statements that [P]laintiff claims she made" on the March 28 Call. Dkt. 128, Tr. 17:1-4; *see* Dkt. 217, Tr. 67:9-:18. Thus, the Court's prior decision did not directly address whether Baddour made the alleged statement. Instead, given the procedural posture and arguments advanced, on top of the unusually broad sweep of Section 6.13, the Court held there were "genuine disputes of material fact" regarding the nature and

Further, the parties' actions following the March 28 Call compel the conclusion that Baddour did not make an actionable false representation concerning P6's post-Merger independence. For example, in an email sent just two days later Camaisa wrote, "I want to clarify that since PRA will own the company, PRA can do whatever they want" with P6.[126] Similarly, P6 executives acted consistent with the understanding that P6 would not operate independently or sell to competitor CROs post-Merger. Turner asked Thoelke for "guidance" on what partners "PRA may []  prefer or not want [P6] to work with" for the Million Veterans Program.[127] He also followed Thoelke's instruction to stop selling to other CROs and specifically agreed post-Merger sales to competitors "shouldn't have happened[.]"[128] Turner's silence

---

extent of Baddour's alleged representation that had to be resolved post-trial. *See id.* Tr. 17:5-18:12; *Carrow v. Arnold*, 2006 WL 3289582, *9 (Del. Ch. Oct. 31, 2006) (finding *post-trial* that "[a]n oral promise also may amount to fraud when the promisor makes a promise with not intention of keeping it."). Additionally, given the bargained-for, atypical preservation of "any fraud" claim "[n]otwithstanding anything to the contrary contained in th[e] Agreement," denial of summary judgment was warranted to allow further factual development. Agreement § 6.13; *see* Dkt. 128, Tr. 32:15-23 (explaining the issues "deserve a fully developed factual record to enable me to apply the law to the facts with precision."); *see also Acierno v. Goldstein*, 2004 WL 1488673, at *6 (Del. Ch. June 25, 2004) ("The Court has the discretion to deny summary judgment where additional factual development would clarify the law or its factual application.").

[126] JX89. Similarly, Turner's closing-day email shows he expected P6 to operate "as part of the PRA family" and "crush[] the competition." JX108.

[127] JX96. Thoelke's reaction suggests he too thought PRA had the authority to direct P6's sales activities and prevent any dealings with competitor CROs. *See id.* ("At this stage I'm tempted to just. Lock [sic] Quintiles?"). Plaintiff's argument that Thoelke's response shows that "[c]learly there was *no* directive *not* to sell to CROs, because otherwise Turner would have simply excluded Quintiles" misses the mark. Dkt. 160 at 12-13. The issue for Plaintiff's fraud claim is not whether PRA imposed a blanket ban on P6's ability to contract with CROs, but whether Baddour falsely represented on the March 28 Call that P6 would operate independently and could continue to sell freely to other CROs post-Merger.

[128] Tr. 40:7-9.

21

concerning Baddour's alleged promise and affirmation of PRA's ability to restrict P6's sales shows that Plaintiff's current interpretation, in litigation, of the March 28 Call does not jive with the parties' contemporaneous understanding of the March 28 Call or how P6 would operate post-Merger.

Contrary to Plaintiff's assertion, the trial testimony does not support finding Baddour made the alleged false representation. Unsurprisingly, the testimony concerning the long-since-passed March 28 Call is contradictory and inconclusive. Baddour did not remember the March 28 Call.[129] Baddour did, however, suggest she would not have told Camaisa and Turner that P6 could "be autonomous after an acquisition," because that "would not have been [PRA's] normal procedure."[130] PRA documents appear consistent with that statement.[131] Baldor testified she probably said PRA would likely allow P6 to complete its existing contracts with competitor CROs.[132] But, she also testified that she communicated to Camaisa and Turner that they should "not [] expect[] CROs to continue to buy [] from us" as "competitors don't

---

[129] Tr. 524:23-535:6. For Baddour, PRA's then-CFO, the March 28 Call was a small part of a busy schedule and one of only a few interactions she had with Camaisa concerning the Merger. *See* Tr. 524:10-16. Baddour was not a primary negotiator for the Merger and did not have regular contact with the P6 deal team. Thus, I am not surprised that Baddour did not recall the March 28 Call and do not hold her lack of recollection against her for credibility purposes.

[130] Tr. 533:18-23.

[131] *See* JX47; JX97.

[132] Tr. 530:13-20 (testifying if P6 was already in a relationship with a CRO, it probably stayed in there.").

normally want to share . . . visibility into their pipeline."[133] That statement is consistent with Camaisa's pre-Merger expectations concerning PRA's plans for P6.[134]

Turner and Camaisa had a different, though inconsistent, recollection of the March 28 Call. Turner testified Baddour stated P6 "would be able to sell directly to [its] pipeline" and operate as an "independent business unit."[135] He recalled Baddour promising to "leave [P6] alone" and "plug [P6] into [PRA's] existing sales cycles" without disrupting P6's pipeline or existing relationships. Camaisa asserted Baddour stated "w[ith] no hesitation" that P6 could continue "selling to CROs . . . post-acquisition."[136] Yet, he also testified Baddour came off "like a salesman" and stated that "we're going to let you sell. Sell, sell, sell. You gave us your pipeline. Do it. Execute. And we'll support you guys and, you know, make your numbers."[137] That type of salesmanship was consistent with Camaisa's pre-Merger expectation that the true value of the deal was the potential for massive growth following P6 and PRA's integration.[138] That Baddour highlighted growth potential on the March 28 Call is

---

[133] Tr. 524:17-525:1.

[134] Tr. 174:8-14. "I just knew it as a CEO . . . [PRA is] going to want to make over the company and run it their way and move the accounts – go after the big fish, the billion dollar companies that[] [are] not in our pipeline. And I made that clear to Linda Baddour."); Tr. 175:10-20 ("I knew that full integration is probably going to happen and [PRA is] going to want it . . . Intuitively I knew [] and everybody else did . . . that [P6] probably may lose CRO revenue because they consider [PRA] a competitor and they'll have an excuse to terminate [P6].").

[135] Tr. 24:8-12.

[136] Tr. 197:1-16.

[137] Tr. 195:19-196:7.

[138] *See, e.g.*, JX13 ("An earnout is small thinking . . . the bigger number is 1B in future growth at stake for PRA. This is a major game changer for the CRO industry and more people have gone to [sic] mobile 6x in the last 5 years. The desktop software is dying, Medidata, ERT,

23

also consistent with the unprecedented increase in volume P6 experience post-Merger after accessing PRA's customers.[139]   Taken together, this evidence along with Camaisa's testimony suggests that, at best for Plaintiff, Baddour's salesman-like statements on the March 28 Call were the sort of "non-actionable puffery" that cannot support a fraud claim.[140]

Ultimately, it is frankly difficult to know what precisely occurred on the March 28 Call.  What the Court knows for certain, however, is (1) the Agreement granted PRA broad discretion to operate P6 as it saw fit; (2) post-Merger, the parties acted consistent with the understanding that PRA could restrict P6's sales to competitor CROs; (3) Baddour provided credible, document-supported testimony that she would not have told Camaisa and Turner that P6 could operate independently; and (4) Camaisa testified, consistent with other evidence, that Baddour came off like a "salesman" on the March 28 Call by touting P6's post-Merger growth potential.  This all strongly suggests Baddour did not make an actionable false statement on the

---

Bioclinica realize this. [PRA] will surpass them because they don't have a patented end to end Clinical Platform" like P6).

[139] *See, e.g.*, JX166 ("[P6] ha[s] never seen this type of volume—nor had the added pressure of delivery expectations that our clients will [put] on them.").

[140] *Trifecta Multimedia Hldgs., Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 463-64 (Del. Ch. 2024) (holding generic statements about an acquiror being "the best partner to accelerate growth" or that the seller would benefit from "collaboration, coordination and shared relationship" are "non-actionable puffery," insufficient to support a fraud claim); *see Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006) (explaining "statements of expectation or opinion about the future of the company and the hoped for results of business strategies" are "generally not actionable" for fraud claims); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004) (concluding statements praising a party's "skill, experience, and resources . . . cannot form the basis for a fraud claim.").

March 28 Call. Just as glaring is the lack of contemporaneous record evidence one would expect if Baddour had made the alleged statements. Given Camaisa's business acumen and skepticism concerning earnouts, at a minimum one would expect him to document any promise concerning P6's post-Merger operations that made accepting an earnout less, in his words, "stupid."[141] Similarly, Turner would have raised Baddour's supposed representation, not acquiesced, when PRA limited sales to competitor CROs. Therefore, I conclude Plaintiff has not carried its burden of proving that Defendants made an actionable false statement sufficient to sustain the fraud claim.

Plaintiff points to a smattering of stray documents to resist that conclusion. Although the documents Plaintiff cites shows his fraud claim was not frivolous, they do not overcome the evidence discussed above.

First, Plaintiff points to Baddour's "acknowledgement of the Acurian model" in response to Camaisa's March 30 email as showing that "PRA was not concerned about selling to other CROs."[142] The Court disagrees. The Acurian model may have been "a good case study" concerning how P6 could operate independently post-Merger.[143] Yet, it stretches beyond reasonableness to infer from Baddour's generic response that she agreed to implement any such model during the March 28 Call or stated PRA was

---

[141] *See* JX02.

[142] Dkt. 154 at 28; *see* Tr. 205:5-8.

[143] Tr. 202:9-205:8 (Camaisa testifying the "Acurian model" was an example of a P6-like entity, Acurian, being acquired by a CRO, PPD, yet still selling to other competitor CROs.).

not concerned about selling to other CROs.[144] Indeed, Camaisa testified that Baddour stated P6 "could probably do the same thing", not that PRA would certainly follow the Acurian model.[145] Such a "'statement of opinion'" cannot support "'a claim of fraud'" simply because it "'did not prove to be an accurate forecast of the future[.]'"[146]

Second, Plaintiff points to a series of internal emails from before and after the March 28 Call where PRA executives discussed looking to "[o]perate P6 independently as a preferred vendor" before offering a "truly integrated solution."[147] Although these communications may suggest Baddour, or some other PRA executive, could theoretically have told Camaisa or Turner that P6 would operate independently for some time post-Merger, they do not compel finding an actionable misrepresentation. For one, it is not clear that P6 ever saw these communications, such that the emails themselves could be the source of an actionable fraudulent statement.[148] More importantly, the emails' full text shows any consideration of potential temporary independence was driven by concerns over the technical feasibility of complete integration immediately after closing, not the promise Plaintiff

---

[144] Specifically, Baddour replied, "Thank you! I look forward to continuing this process." JX88.

[145] Tr. 203:8-14.

[146] *Appel v. Berkman*, 180 A.3d 1055, 1060 n.25 (Del. 2018) (quoting *Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 148 (Del. Ch. 2004)).

[147] JX48; JX47; *see* JX97.

[148] *See Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 284 (Del. Super. 1960) (holding a plaintiff asserting fraud must show "[t]he deceiver [] ma[d]e a false representation of a material fact *to the victim*[.]" (emphasis added)).

alleges.[149] That PRA executives thought they could dictate the timing and extent of integration supports, rather than undermines, the conclusion that Baddour made no absolute representation concerning P6's independence.

Finally, Plaintiff relies on the fact that PRA prohibited P6 sales to competitor CROs post-Merger. Weighing the evidence, the extent of any such prohibition is frankly unclear. Although PRA barred generating new business with competitors, Thoelke informed P6 it could sell to CROs with whom P6 had existing or "in flight" contracts.[150] Additionally, the facts suggest PRA was driven in part by a decision to prioritize its clinical trial customers, once it was clear that P6 could not handle the increased post-Merger volumes.[151] That is a sound business decision given that, as even Camaisa recognized, the Merger's main value proposition came from increasing market share in the clinical trial space.[152] More fundamentally, whether PRA restricted P6's ability to sell to CROs post-Merger sheds no light on whether Baddour made any actionable false statement during the March 28 Call.

---

[149] *See* JX48 (stating integration "assumes seamless, pre-built integration with PRA systems[.]"); JX97 ("I think at this stage we don't have any idea how or what components would integrate into [PRA's] IT roadmap. I think that we need to be careful in layering on too much 'PRA' architecture immediately, we don't want to take away from the good parts of what [P6] ha[s] by forcing them into our architecture.").

[150] *See, e.g.*, Tr. at 405:22-406:1, 459:15-460:10; JX386.

[151] *See, e.g.*, JX319.

[152] *See* JX13; JX47; Tr. 398:2-399:1; Tr. 405:3-406:1. Indeed, it strains credulity to think PRA paid $40 million to acquire P6 while simultaneously agreeing to not exercise the rights of ownership.

27

Thus, the evidence Plaintiff cites does not alter the Court's conclusion—Plaintiff has not proven by a preponderance of the evidence that Baddour made a false statement during the March 28 Call. This alone defeats Plaintiff's fraud claim.

### 2. Plaintiff Did Not Prove Justifiable Reliance

Even if Plaintiff had proved an actionable false statement, the fraud claim would fail for lack of justifiable reliance. For one, the existence of a misstatement and justifiable reliance are to some extent bound up together. As discussed, at best for Plaintiff, Baddour may have expressed some puffery concerning P6's post-Merger growth and ability to "sell, sell, sell" that Camaisa recognized as salesman-like talk.[153] Yet, this Court has recognized that sophisticated parties, like Camaisa, "generally cannot rely [] [] on puffery [or] expressions of mere opinion[.]"[154] Further, Delaware caselaw provides that "[a] party cannot p[rove] justifiable reliance . . . where the contract contradicts an allegedly inducing misrepresentation."[155] As discussed, Section 2.7(h) contradicts any alleged statement concerning post-Merger independence and sales to CROs on which P6 allegedly relied. These legal doctrines provide strong evidence that Plaintiff did not justifiably rely on any alleged false statement by Baddour.[156]

---

[153] *See* Tr. 195:19-196:7.

[154] *Vichi*, 85 A.3d at 775.

[155] *Paperless Solutions*, 2025 WL 1466603, at *3 (citing *Chapter 7 Trustee Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *6 (Del. Ch. Sept. 22, 2016)).

[156] The Court's prior summary judgment ruling did not find otherwise. *See* Dkt. 128, Tr. 28:12-33:2. At summary judgment, the Court recognized case law suggests "an expression of future intent can serve as the basis of a fraud claim, but it's . . . a fairly tenuous claim that requires

The evidentiary record further supports finding that Plaintiff lacked justifiable reliance. Under Delaware law, "it is axiomatic that a plaintiff does not justifiably rely on a defendant's misrepresentation if the plaintiff knows that the representation is false."[157] Camaisa repeatedly testified he "knew that full integration [was] probably going to happen,"[158] believed P6 "probably may lose CRO revenues,"[159] and "thought . . . [PRA's] going to tell [P6] not to sell to [its] competitors."[160] Indeed, Camaisa specifically testified he "predicted in advance" that PRA would prohibit P6 from selling to competitors.[161] Documents from before and after closing confirm Camaisa knew PRA would not allow P6 to operate independently or sell to competitor CROs.[162] For example, the emails analyzed above show (1) Camaisa understood "PRA will own [P6] [and] can do whatever they want";[163] (2) Turner felt he needed PRA's

---

the plaintiff to thread a bunch of needles." *Id.* Tr. 29:15-20. The Court also recognized that such claims are not favored where the alleged misrepresentation contradicts a written agreement. *See* Tr. 25:22-26:12, 29:20-21 (citing *Chapter 7 Trustee Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950 (Del. Ch. Sept. 22, 2016)). Yet, recognizing the Agreement's lack of an anti-reliance clause and "very broad express fraud carve-out[,]" the Court concluded there were genuine issues of material fact that "deserve[d] a fully developed factual record[.]" *Id.* Tr. 30:15-31:10, 32:20-23 (citing *Carrow*, 2006 WL 3289582). Accordingly, the Court makes its current ruling with the benefit of the fully developed post-trial record.

[157] *Arwood v. AW Site Services, LLC*, 2022 WL 705841, at *24 (Del. Ch. Mar. 9, 2022) (citations omitted).

[158] *E.g.*, Tr. 175:10-15.

[159] *E.g.*, Tr. 175:16-24.

[160] *E.g.*, Tr. 184:10-13.

[161] Tr. 184:13-14.

[162] *See* JX36 ("My concern is this earnout to us Would amount to zero"); JX357 ("We knew this Would happen").

[163] JX89.

approval before contracting with a competitor CRO;[164] and (3) Turner expected P6 to operate within PRA with the goal of taking competitors' market share.[165] Thus, the Court holds that even if Baddour made the alleged representations, Plaintiff could not have justifiably relied upon them. This independently defeats Plaintiff's fraud claim.[166]

* * *

This case presents a pointed example of why it is important for transactional parties to draft contractual language concerning fraud carefully.[167] The parties here failed to include an anti-reliance clause in the Agreement. Instead, they bargained for an unusual provision, Section 6.13, which expressly disclaims waiver or "other limitation" of "any fraud" claim "[n]otwithstanding anything to the contrary contained" in the Agreement, including Sections 2.7(h) and 6.6. When drafters include phrases like "notwithstanding anything to the contrary," they should perhaps do so with pause and certainly in full awareness of such phrases' powerful effect.

---

[164] JX96.

[165] JX108.

[166] The lack of any justifiable reliance also defeats Plaintiff's promissory fraud claim. *See MicroStregy Inc. v. Acacia Researh Corp.*, 2010 WL 5550455, at *15 (Del. Ch. Dec. 30, 2010) (noting to prove "a claim of promissory fraud, in that the alleged false representations are promises or predictive statements of future intent rather than past or present facts, the plaintiff must meet an even higher threshold" than standard fraud); *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *6, *9-10 (Del. Ch. Dec. 23, 2008) (noting justifiable reliance is a required element of a promissory fraud claim).

[167] *See* Glenn D. West, *The Pesky Little Thing Called Fraud: An Examination of Buyers' Insistence Upon (and Sellers' Too Ready Acceptance of) Undefined "Fraud Carve-Outs" in Acquisition Agreements*, 69 The Business Lawyer 1049 (2014).

Here, a fraud claim that could otherwise have been resolved at the pleading stage with a handful of drafting changes became something else entirely.[168]

Resolution of this matter required trial to develop a full "factual record to enable [the Court] to apply the law to the facts with precision."[169] With the benefit of that factual development, the Court concludes Plaintiff's fraud claim fails for lack of a false statement and justifiable reliance.

## B. Plaintiff Did Not Prove Defendants Breached the Agreement by a Preponderance of the Evidence.

Plaintiff alleges Defendants breached Section 2.7(g) of the Agreement by knowingly acting for the primary purpose of preventing P6 from realizing any earnout payment.[170] To prevail on its breach claim Plaintiff must prove by a preponderance of the evidence (1) "the existence of a contract"; (2) Defendants' "breach of an

[168] *See Trifecta*, 318 A.3d at 465 ("Assessing reliance requires a context-dependent inquiry . . . [t]he issue is not generally suitable for resolution on a motion to dismiss unless a fully integrated contract contains an explicit anti-reliance representation . . . an integration clause, standing alone, is not sufficient to bar a fraud claim; the agreement must also contain explicit anti-reliance language."); *Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at *9 (Del. Ch. Dec. 13, 2021) ("a standard integration clause, without anti-reliance language, cannot disclaim reliance on representations outside the written contract."). Although some decisions suggest that the presence of an integration clause alone may act to bar fraud claims concerning pre-closing oral promises of future intent that contradict a written agreement's terms, those decisions did not confront a provision like Section 6.13, which by its express terms trumps the integration clause. *See Shareholder Representative Services LLC v. Albertsons Companies, Inc.*, 2021 WL 2311455, at *2 (Del. Ch. July 7, 2021); *Black Horse Cap. L.P. v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *24-25 (Del. Ch. Sept. 30, 2014); *see also Trifecta*, 318 A.3d at 466 ("The *Albertsons* and *Black Horse* decisions thus relied on *Abry Partners* for a proposition that *Abry Partners* rejects. . . . Although a minority of decisions distinguish between misrepresentations of fact (fraud in the factum) and other types of misrepresentation (fraudulent inducement), the prevailing majority rule does not draw that distinction.").

[169] Dkt. 128, Tr. 32:15-23.

[170] Dkt. 34 ¶¶ 64-70.

obligation imposed by that contract"; and (3) "resultant damages."[171]  There is no

dispute that the Agreement is a valid contract.  Thus, the Court's analysis focuses on

whether Plaintiff carried its burden concerning the second element.  For the following

reasons, the Court concludes Plaintiff failed to show PRA breached the Agreement.

Section 2.7(g)(i) provides, "[PRA] shall not knowingly take (or knowingly cause

any of its controlled Affiliates to take) any action for the primary purpose of

preventing the achievement of the Contingent Consideration Event[,]" *i.e.* P6

triggering an earnout payment.[172]  Proving breach of this provision is an "unusually

heavy burden."[173]  Indeed, interpreting almost identical language, this Court

previously held such a provision permitted a buyer "to take actions [] [it] knew would

frustrate [an earnout], so long as the action has some other primary purpose."[174]  In

evaluating an action's primary purpose, the Court looks to "circumstantial evidence

of [the] action's purpose[,]" not just "the action itself."[175]

Camaisa argues PRA breached the Agreement by preventing P6 from

operating as a stand-alone business and selling to competitor CROs post-Merger. Yet,

the Court concludes PRA had a plainly legitimate basis for both those challenged

---

[171] *VLIW Tech, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[172] Agreement § 2.7(g)(i).

[173] *Fortis Advisors LLC v. Medtronic Minimed, Inc.*, 2024 WL 3580827, at *6 (Del. Ch. July 29, 2024).

[174] *Id.* at *3, 6 (interpreting contract text that provided "Buyer shall not take any action intended for the primary purpose of frustrating the payment of Milestone Consideration hereunder." (internal quotes omitted)).

[175] *Id.* at *7.

actions. Additionally, the trial evidence shows P6's executives understood PRA's business rationale and expected PRA to integrate P6 and bar sales to competitor CROs.

From the outset, PRA's strategic rationale for the Merger was to offer a full, end-to-end virtual model, thereby differentiating itself from other CROs to increase market share.[176] Executing that vision required "incorporating [P6's] platform into [PRA's] full-service delivery model."[177] Thoelke communicated to P6 the need to integrate P6 into PRA's existing business.[178] Camaisa understood the deal would be a "fully integrated project for [PRA]" and "felt [] most logical CEOs of billion-dollar companies [are] going to integrate this product fully."[179] Indeed, before the Merger P6 recognized the benefits of integrating with PRA in choosing it over other possible transaction counterparties.[180]

---

[176] *See* JX47 ("No other CRO will have the capability to fully integrate an end to end, cloud based, patient engagement solution. . . [t]his ability to be a one stop shop should be considered a clear advantage in the market."); JX11; Tr. 398:2-399:1, 455:21-456:8.

[177] Tr. 396:17-397:12; *see* JX11 (laying out Thoelke's vision for how PRA would integrate P6's software); JX84 (Thoelke's "Position Support Paper" concerning the Merger, repeatedly emphasizing the need to integrate P6 within PRA's ecosystem).

[178] *See, e.g.*, Tr. 399:7-20; JX23. Although Thoelke expressed some concern regarding the technological feasibility of completely integrating immediately post-Merger, PRA always maintained the end goal was total integration. *See* JX97; JX84.

[179] Tr. 187:4-8, 194:2-9.

[180] Specifically, P6 "wanted to get [its] product out to pharma," and PRA had relationships with major biopharmaceutical companies that P6 "c[ould]n't touch" on a standalone basis. Tr. 11:8-14, 26:13-22, 177:7-179:10; *see* JX13. P6 noted PRA had extensive resources and a large sales division. *See, e.g.*, Tr. 26:13-22, 179:1-10, 396:24-397:9. Thus, P6 believed integrating with PRA could "significantly enhance [P6's] revenue pipeline." *See, e.g.*, Tr. 26:13-22, 179:1-10. Accordingly, P6 executives believed business with PRA's large biopharmaceutical companies provided the best change of triggering an earnout. *See* JX27 (Camaisa writing that because P6's business with CROs "would go away," P6 "would have to emphasize [biopharma

33

In addition to integration, PRA's business justification for the Merger required preventing competitor CROs from using P6's technology. To gain market share in the highly competitive CRO industry, PRA had to offer a differentiated product.[181] For PRA to be the "first [CRO] to . . . fully implement a[] web/cloud based mobile solution . . . and [] capture significant market share," it necessarily had to prevent other CROs from accessing the same technology.[182] Thus, PRA's pre-Merger projections for P6's revenue explicitly excluded income from other CROs,[183] a fact P6 executives recognized.[184] P6's investment banker flagged revenue from other CROs as "at risk."[185] Camaisa himself "predicted" PRA would "tell [P6] probably not to sell to . . . competitors" and "knew intuitively" competitor CRO revenue was "not going to last."[186] In fact, Camaisa recognized that prioritizing clinical trial customers gave P6 the best chance of triggering an earnout.[187] Thus, pre-Merger all parties understood PRA had legitimate business reasons, unrelated to the earnout, for integrating P6 and preventing sales to competitor CROs.

customers].").  Camaisa acknowledged, "[w]ith Sanofi [a biopharma company] we could possibly do 50M in business alone." JX89.  Camaisa specifically stylized business with biopharmaceutical companies as "the faste[st] way to the earnout[.]" *Id.*

[181] Tr. 405:3-406:1.

[182] JX84.

[183] *See* JX101; JX106.

[184] *See* JX76.

[185] JX43.

[186] Tr. 184:3-14, 196:13-24.

[187] *See* JX27.

Post-merger, PRA executed on that vision. Although technical and customer-relationship concerns made integration gradual, Thoelke started the process "immediate[ly]."[188] PRA had high hopes for P6 and began including its software in new proposals from the outset.[189] Although PRA may have allowed P6 to complete some ongoing contracts with other CROs, it prioritized larger clinical trial customers from whom PRA hoped to generate repeat business.[190] This resulted in unprecedented deal flow for the relatively small P6 team.[191] PRA began receiving complaints from the very clinical trial clients it wanted to target, driven largely by performance issues caused by P6's outdated Ruby on Rails infrastructure.[192] Instead of shelving P6, as one might expect if the goal was to prevent an earnout, PRA implemented remedial measures to get P6 back on track.[193] Yet, those efforts proved

---

[188] JX110; JX128.

[189] *See, e.g.*, Tr. 437:11-14, 444:24-445:9, 541:9-12.

[190] JX424 at ¶ 8; JX132.

[191] *E.g.*, JX168. PRA's integration efforts, including with respect to its global sales team, and P6's significant deal flow because of those efforts, undermines Plaintiff's argument that the primary motivation behind terminating two P6 sales representatives was to prevent an earnout. Moreover, the record reflects that the two representatives directly reported to Halbridge, who made the call to fire them based on poor performance. *See, e.g.*, JX167; Tr. 633:11-634:2.

[192] *See* JX170 (Sanofi writing it was "embarrassed to roll out [P6's] apps."); JX182 (Sanofi telling PRA that P6's technology "would be better for designing apps for lawn mowers etc."); JX183 (BMS stating it would not approve P6 for its services); JX185 (BMS stating P6's performance issues drove its decision to take its business elsewhere).

[193] *See, e.g.*, JX275 ("We have an incredibly exciting future ahead of us—but we just need to get the fundamentals in place so our foundation is strong and will enable and support growth and expansion").

unsuccessful as customers continued to complain and one demanded a refund.[194] Accordingly, PRA made the rational business decision to limit P6's business in order to protect its credibility and maintain customer satisfaction.[195]

This evidence shows PRA's primary purpose for integrating P6 as a non-autonomous business and preventing it from selling to competitor CROs was *not* to prevent P6 from triggering an earnout. Instead, PRA acted to implement the business plan that justified the Merger in the first place. It was only after P6 failed to execute under that plan, despite repeated attempts to remedy performance issues, that PRA decided to throttle back P6 sales. As such, the Court concludes Plaintiff has not met its unusually heavy burden of proving Defendants breached Section 2.7(g)(i) of the Agreement. Plaintiff asserts several contrary arguments—none is convincing.

First, Plaintiff points out PRA decided to "slow down" and eventually pause P6's sales as evidence PRA acted to prevent any earnout payment. But PRA made those decisions (1) after beginning the integration process and sending P6 substantial deal flow; (2) amid troubling performance issues with P6's product, which strained PRA's business relationships and credibility; and (3) after PRA's unsuccessful efforts

---

[194] *See* JX373 (Paratek identifying "performance issues in the test environment" and "concerns over the quality of the application and the experience," not to mention "poorly written" scripts and lack of "complete instructions."); JX317 (Sanofi demanding a "[$]1.5M refund for undelivered work.").

[195] *See* JX373 (Thoelke telling Turner that P6's performance issues were "ruining credibility"); JX307; PTO § 2, ¶ 31. At this point, PRA had already included P6 in over fifty outstanding proposals, and Thoelke "want[ed] to ensure that we have the resources and capability to deliver that work." JX319.

to mitigate those issues. Thus, as discussed, the Court does not view the evidence as showing that PRA's decision to limit P6's sales was driven primarily by a desire to prevent an earnout. Indeed, it appears the opposite is true. PRA repeatedly tried to address performance issues so P6 could succeed. As such, this argument does not save Plaintiff's breach claim.

Second, Camaisa relies on the fact that PRA "shelv[ed]" Site Startup after the Merger.[196] Yet, Plaintiff does not meaningfully address the fact that P6 designed Site Startup specifically for PDD, a competitor CRO under an exclusive licensing agreement.[197] It was thus consistent with the business rationale discussed above for PRA to limit competitor access to Site Startup. And, in fact, PPD terminated the exclusive license agreement—not wanting to contribute funds to its competitor PRA.[198] Moreover, PRA had a legitimate reason for shelving Site Startup beyond any alleged intent to prevent an earnout—namely, its PSO software had "web-based" capabilities that Site Startup lacked.[199] Thus, the evidence does not support the conclusion that PRA knowingly "shelved" Site Startup to prevent an earnout.

[196] Dkt. 154 at 35-36.

[197] Tr. 17:17-18:2.

[198] *See* JX125.

[199] JX229. Indeed, Turner testified he believed there was a "good faith [] [] business reason" for PPD to move away from Site Startup. Tr. 100:12-20. Namely, "PPD was sensitive about having a competitor working on their proprietary Site Startup business plan." Tr. 367:12-368:2. Nevertheless, PRA only decided to shelve Site Startup in favor of its own PSO application after "Turner and the P6 staff along with the PRA staff [] [] did a full evaluation of both . . . and it was determined that the [PRA] product that was being developed was more effective." Tr. 482:22-483:10.

Third, Plaintiff argues PRA fired Turner for raising concerns regarding PRA's actions, thereby evidencing Defendants' intent to prevent an earnout.[200] It is notable that, rather than raise such concerns early and consistently, Turner primarily began voicing his complaints a year post-closing, after P6's fairly severe performance issues had materialized and achievement of the earnout was plainly unlikely to occur.[201] Plaintiff's argument relies on the assertion that "[t]he circumstances demonstrate that PRA had no legitimate basis for firing Turner."[202] The trial record, however, contradicts that assertion.

As P6's post-Merger president, Turner was responsible for managing the P6 team.[203] As discussed, under Turner's leadership P6 experienced continuous performance issues leading to serious customer complaints and lost business. Such complaints from key customers provide one justification for Turner's termination. Amidst that backdrop, PRA also concluded that P6's needed to overhaul its coding infrastructure to configure trials "more quickly and deliver on our timelines."[204] Halbridge and O'Gorman agreed, expressing "an imminent concern that the business

---

[200] Dkt. 154 at 45-47. Plaintiff argues Thoelke was largely non-responsive to Turner's requests for a formal meeting to discuss items that Turner believed were hindering P6's ability to achieve the earnout, as well as the complaint letter from Camaisa and other P6 stockholders. *Id.* Plaintiff further argues that PRA's CEO admitted during his deposition testimony that Turner's delivery of the complaint letter was a *factor* in his termination. *Id.*

[201] *See* PTO § 2, ¶¶ 32-33; JX345; JX349; JX361.

[202] *Id.* at 46.

[203] *See, e.g.*, Tr. 38:14-39:6.

[204] *Id.*; *see* Tr. 448:18-23.

could collapse if [P6] didn't [change its coding language]."[205] Indeed, many of the customer complaints referenced P6's outdated Ruby on Rails software. Turner, however, actively resisted overhauling P6's coding infrastructure or switching from Ruby on Rails.[206] Having heard and weighed the testimony on this internal dispute, this too provides a reason for Turner's termination distinct from any complaints Turner communicated regarding PRA's handling of the earnout. Plaintiff cites no contrary evidence demonstrating PRA fired Turner for the primary purpose of silencing his complaints regarding how PRA's actions affected P6's earnout. If anything, firing Turner could reasonably be expected to have the opposite effect— causing him to focus solely on the earnout once he was no longer working at P6. In any event, the weight of evidence shows PRA primarily terminated Turner due to his responsibility, as an executive, for P6's ongoing performance issues and his recalcitrance over how to remedy those issues.[207]

Finally, Plaintiff points to PRA's accounting "release[] [of] the $8.4 million contingent consideration liability" as noted in its 2017 10-K.[208] Plaintiffs suggests that statement shows "PRA *planned* to prevent achievement" of the earnout.[209] If there had not been a trial and the attendant creation of a consideration evidentiary

---

[205] Tr. 449:11-14.

[206] Tr. 448:23-24; *see* Tr. 430:23-24.

[207] JX349 (Thoelke expressing Turner "had a completely different vision for the way the product should be built."); *see* JX352; Tr. 449:15-19.

[208] JX305; PTO § 2, ¶ 29 (noting PRA released the contingent liability in the fourth quarter of 2017).

[209] Dkt. 154 at 36-41.

record, one could say that select contemporaneous emails and projections relating to this accounting disclosure decision may raise questions here.[210] But, obviously, there was a trial. And the weight of the evidence shows, during this period, (1) PRA's understandably mounting frustration with an acquisition of P6 that was quickly revealing itself to be a pig-in-a-poke and (2) PRA's decision to release the contingent earnout liability was reasonably supported by the facts on the ground. Indeed, the emails on which Plaintiff relies note that "there was a large variance between actuals and forecast" regarding P6's sales during the post-closing period—which is unsurprising given P6's post-merger performance issues.[211] As such, the release is consistent with PRA's expressed intent to "be conservative" with respect to reporting "anything material for [P6] revenue in Q4."[212] Additionally, PRA's external auditor approved the contingent consideration liability release—suggesting doing so was the result of proper accounting analysis.[213] The Court agrees. By that point, P6's ongoing performance issues and resulting reduction in business made it sufficiently unlikely that P6 would trigger an earnout, such that PRA's decision to release the contingent liability was proper.

Thus, none of Plaintiff's arguments demonstrate by a preponderance of the evidence that PRA knowingly acted with the primary purpose of frustrating P6's

---

[210] *See* JX190; JX252; JX254.

[211] *E.g.*, JX190; *see* JX190.

[212] JX201.

[213] JX301.

ability to trigger an earnout under the Agreement. Accordingly, the Court concludes Plaintiff failed to carry its burden on its breach of contract claim.

## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has not met its burden of proving its fraud and breach of contract claims by a preponderance of the evidence. Therefore, judgment is entered in favor of Defendants and against Plaintiff. The parties are instructed to submit a form of implementing order within ten business days.